# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | |
| v. | : | **Case No. 1:21-cr-00505 (RCL)** |
| | : | |
| ISAAC SAMUEL YODER, | : | |
| | : | |
| Defendant. | : | |

## DEFENDANT'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

A two-day bench trial in this criminal matter was held on March 20 and 21, 2023. The Government charged Defendant Isaac Yoder ("Defendant" or "Yoder") by Information with: (1) Entering and Remaining in a Restricted Building, in violation of 18 U.S.C. § 1752(a)(1); (2) Disorderly and Disruptive Conduct in a Restricted Building, in violation of 18 U.S.C. § 1752(a)(2); (3) Violent Entry and Disorderly Conduct in a Capitol Building, in violation of 40 U.S.C. § 5104(e)(2)(D); and (4) Parading, Demonstrating, or Picketing in a Capitol Building, in violation of 40 U.S.C. § 5104(e)(2)(G). Second Superseding Information, ECF No. 32. In support of its case, the Government introduced testimony from four witnesses: (1) Inspector Lanelle Hawa of the United States Secret Service; (2) Captain Ronald Ortega of the United States Capitol Police; (3) Former FBI Special Agent Allen Purcell; and (4) Former Lieutenant Dennis Kelly of the United States Capitol Police. The Defendant testified in support of his case. Additionally, the Court admitted 42 Government exhibits (including one stipulation between the parties), and ten Defense exhibits into evidence. Below are the parties' proposed findings of fact and conclusions of law. The parties agree on paragraphs 1-9, 12-13, 15-20, 22-27, 29, 32-33, 35. As indicated below, the parties have each proposed alternative language for paragraphs 10-11, 14, 21, 28, 30-31, 34, 36-40. Also below are the government's proposed conclusions of law. The defendant will file proposed conclusions of law separately.

## PROPOSED FINDINGS OF FACT

**A.**     **The Attack at the U.S. Capitol on January 6, 2021**

1.     The U.S. Capitol is located at First Street between Independence Avenue and Constitution Avenue, in Washington, D.C.  Tr. at 55 (Testimony of Captain Ortega).  The Capitol was closed to the public at the beginning of the pandemic in March 2020 and remained closed on January 6, 2021.  Tr. at 49-50 (Testimony of Captain Ortega).

2.     On January 6, 2021, the west side of the U.S. Capitol contained scaffolding where a stage was under construction for the upcoming Inauguration.  GX 109 (Rendering of Capitol with Inauguration Stage); Tr. at 44-46 (Testimony of Captain Ortega).

3.     In preparation for Vice President Michael Pence's visit to preside over the counting of the votes of the Electoral College on January 6, the United States Secret Service (USSS) collaborated with the United States Capitol Police (USCP) to adopt a security perimeter around the exterior plaza of the Capitol.  GX 104 (Perimeter Map); GX 107 (Worksheet); Tr. at 14-20 (Testimony of Inspector Hawa).

4.     Multiple levels of restrictions around the Capitol included an outer perimeter around the Capitol Complex with snow fencing and/or bike racks.  Tr. at 49-56 (Testimony of Captain Ortega).  There were signs on the perimeter of the Capitol indicating that no entry was allowed.  The signs stated, "Area Closed by Order of the United States Capitol Police Board." .  GX 105 and 106 (Area Closed Signs); Tr. at 38 (Testimony of Inspector Hawa); Tr. at 51-54 (Testimony of Captain Ortega).  Inside the outer perimeter, there was another area of bike racks and signs, and the scaffolding on the Upper West Terrace also had additional barriers.  Tr. at 49-56, 111-112, 122-25 (Testimony of Captain Ortega).

5.     Only authorized people with appropriate identification were allowed access inside the Capitol, and those persons had to submit to security screening.  Tr. at 48-49, 81-83 (Testimony

of Captain Ortega); Tr. at 242-244 (Testimony of Lieutenant Kelly).  Items that could be used as weapons, such as swords or flagpoles, were not permitted inside the Capitol building.  Tr. at 81-83, 112 (Testimony of Captain Ortega).

6.      Vice President Pence, accompanied by his wife and their daughter, as well as his security detail, staff, and additional personnel, traveled to the Capitol on January 6, 2021.  Tr. at 20 (Testimony of Inspector Hawa).

7.      On January 6, 2021, a joint session of the United States Congress convened at the Capitol. GX 301 (Montage of Video Footage from the U.S. House and Senate); 601 (Stipulation as to the Certification of the Electoral College Vote).  During the joint session, elected members of the United States House of Representatives and the United States Senate were meeting in separate chambers of the Capitol to certify the vote count of the Electoral College of the 2020 Presidential Election, which had taken place on Tuesday, November 3, 2020.  GX 601 (Stipulation as to the Certification of the Electoral College Vote).

8.      The joint session began at approximately 1:00 PM, as required. GX 301; GX 601; Tr. At 20-22 (Testimony of Inspector Hawa); U.S. Const., Amend. XII ("the president of the Senate shall, in the presence of the Senate and House of Representatives, open all the certificates and the votes shall then be counted"); 3 U.S.C. § 15 Counting electoral votes in Congress ("Congress shall be in session on the sixth day of January succeeding every meeting of the electors. The Senate and House of Representatives shall meet in the Hall of the House of Representatives at the hour of 1 o'clock in the afternoon on that day, and the President of the Senate shall be their presiding officer.").  Shortly thereafter, by approximately 1:15 PM, the House and Senate adjourned to separate chambers to resolve a particular objection. Vice President Michael Pence was present and presiding, first in the joint session, and then in the Senate chamber. Tr. at 21;  GX 301; GX 601.

3

9.      As the proceedings continued in both the House and the Senate, and with Vice President Pence present, a large crowd gathered outside the Capitol.  GX 303A; Tr. at 22-24 (Testimony of Inspector Hawa); Tr. at 56-57 (Testimony of Captain Ortega).  Temporary and permanent barricades, as noted above, were in place around the exterior of the Capitol, and United States Capitol Police (USCP) officers were present and attempting to keep the crowd away from the Capitol Building and the proceedings underway inside.  GX 303A; Tr. at 56-58, 85-87 (Testimony of Captain Ortega).  By approximately 1:15 p.m., members of the crowd had penetrated the outer perimeter and began congregating on the west front of the Capitol.  Tr. at 22-24 (Testimony of Inspector Hawa).

10.

a.      <u>Government's proposal</u>:  By approximately 2:00 p.m., certain individuals in the crowd forced their way through and inside the barricades. GX 303A; Tr. at 57-59 (Testimony of Captain Ortega).  Officers of the USCP were forced to retreat and the crowd advanced to the exterior façade of the building. GX 303A; Tr. at 65-66 (Testimony of Captain Ortega).  The crowd was not lawfully authorized to enter or remain in the building.  Had they been permitted to enter, prior to entering the building, members of the crowd would have been required to submit to security screenings and/or weapons checks as required by USCP officers or other authorized security officials.  Tr. at 81-83 (Testimony of Captain Ortega); Tr. at 276 (Testimony of Lieutenant Kelly).

b.      <u>Defendant's proposal</u>: Eventually, certain individuals in the crowd forced their way through and inside the barricades. GX 303A; Tr. at 57-59 (Testimony of Captain Ortega). Officers of the USCP were forced to retreat and the crowd advanced to the exterior façade of the building. GX 303A; Tr. at 65-66 (Testimony of Captain Ortega).   Had the Capitol been open to the public, prior to entering the building, members of the crowd would have been required to

submit to security screenings and/or weapons checks as required by USCP officers or other authorized security officials.  Tr. at 81-83 (Testimony of Captain Ortega); Tr. at 276 (Testimony of Lieutenant Kelly).

11.

    a.    <u>Government's proposal</u>:  At such time, the certification proceedings were still underway, and the exterior doors and windows of the Capitol were locked or otherwise secured as the facility had been placed in a lockdown due to the presence of the hostile crowd at the immediate exterior of the building.  Tr. at 68-70 (Testimony of Captain Ortega) (explaining the Capitol was on lockdown and describing relocation efforts); Tr. at 22-24 (Testimony of Inspector Hawa) (describing updates on security breaches).  Members of the USCP attempted to maintain order and keep the crowd from entering the Capitol; however, shortly at approximately 2:13 p.m., individuals in the crowd forced entry into the Capitol, including by breaking windows and by assaulting members of law enforcement, as others in the crowd encouraged and assisted those acts. GX 303A; Tr. at 89-93 (Testimony of Captain Ortega).  The West Front of the Capitol outside of the Senate Wing Door was an area of "melee" and assaults against law enforcement.  Tr. at 278 (Testimony of Lieutenant Kelly).

    b.    <u>Defendant's proposal</u>:  At such time, the certification proceedings were still underway, and the exterior doors and windows of the Capitol were locked or otherwise secured as the facility had been placed in a lockdown due to the presence of the crowd at the immediate exterior of the building.  Tr. at 68-70 (Testimony of Captain Ortega); Tr. at 22-24 (Testimony of Inspector Hawa).  Members of the USCP attempted to maintain order and keep the crowd from entering the Capitol; however, shortly at approximately 2:13 p.m., individuals in the crowd forced entry into the Capitol, including by breaking windows and by assaulting members of law enforcement, as others in the crowd encouraged and assisted those acts. GX 303A; Tr. at 89-93

(Testimony of Captain Ortega).  The West Front of the Capitol outside of the Senate Wing Door was an area of "melee".  Tr. at 278 (Testimony of Lieutenant Kelly).

12.     The Senate Wing Door is a fire exit located on the first floor of the Capitol.  GX 102 (U.S. Capitol Floor Plan – Floor 1); Tr. at 70-71, 73 (Testimony of Captain Ortega); Tr. at 240-241 (Testimony of Lieutenant Kelly).  It is used only during emergency situations and emits a "very loud beeping noise" when opened.  Tr. at 71.  At approximately 2:13 p.m., members of the crowd breached the Senate Wing Door and windows on both sides of the Senate Wing Door.  GX 303A; Tr. at 90-95 (Testimony of Captain Ortega).

13.     At approximately 2:20 p.m., members of the House of Representatives and of the Senate, including the President of the Senate, Vice President Pence, were instructed to—and did—evacuate the chambers. GX 108 (Video of Pence Evacuation); Tr. at 24-26 (Testimony of Inspector Hawa); GX 601 (Stipulation as to the Certification of the Electoral College Vote).  Accordingly, all proceedings of the United States Congress, including the joint session, were effectively suspended until shortly after 8:00 PM on January 6, 2021.  GX 601.

14.

        a.     <u>Government's proposal</u>:  In light of the dangerous circumstances caused by the unlawful entry to the Capitol—including the danger posed by individuals who had entered the Capitol without any security screening or weapons check—Congressional proceedings could not resume until after every unauthorized occupant had been removed from or left the Capitol, and law enforcement confirmed that the building was secured. Tr. at 29-30 (Testimony of Inspector Hawa explaining that law enforcement conducted security sweeps there were no unauthorized individuals and no weapons or anything of harm to the Members of Congress or anyone involved in the event); Tr. at 70 (Testimony of Captain Ortega describing relocation of members of the Senate); Tr. at 250-252, 279 (Testimony of Lieutenant Kelly stating that law enforcement cleared

the building so that the proceedings could resume because the unauthorized individuals created a "pandemonium" and prevented Members of Congress and their staff from "conduct[ing] orderly business").

b.    Defendant's proposal:  In light of the circumstances caused by the unlawful entry to the Capitol—including the potential danger posed by unauthorized individuals who may have weapons, Congressional proceedings could not resume until after every unauthorized occupant had been removed from or left the Capitol, and law enforcement confirmed that the building was secured. Tr. at 29-30; Tr. at 70; Tr. at 250-252, 279.

15.    The proceedings resumed at approximately 8:00 p.m. after the building had been secured.  GX 601.

16.    Vice President Pence remained in the Capitol complex from the time he was evacuated from the Senate Chamber until the session resumed.  Tr. at 27-29 (Testimony of Inspector Hawa).

17.    The certification of the vote count of the Electoral College amounted to "Government business or official functions" as those terms are used in Title 18, United States Code, Section 1752(a)(2). It also amounted to a "session of Congress or either House of Congress," and a "hearing before, or . . . deliberations of, a committee of Congress or either House of Congress," as those terms are used in Title 40, United States Code, Section 5104(e)(2)(D).   GX 601.

**B.    Isaac Yoder's Participation in the January 6, 2021, Capitol Riot**

18.    Isaac Yoder, 34, is a self-employed locksmith who resides in Nevada, Missouri, and has been the owner of Yoder Lock & Key since 2014.  Tr. at 286-287 (Testimony of Defendant). He has been married for ten years and has three children. Tr. at 291-92. (Testimony of Defendant).

19.     Isaac Yoder traveled with his father, three of his brothers, his sister-in-law, his niece, and his nephew from Missouri to Washington, D.C. to attend a rally in support of President Donald Trump.  Tr. at 136-37 (Testimony of Special Agent Purcell); Tr. at 305 (Testimony of Defendant).  Yoder "was excited" because "President Trump was calling the people to come."  Tr. at 304-305  Yoder testified that when he decided to attend, he believed the event could not be construed as "something fringe" or that things could go wrong because it was the President leading the event. Tr. at 304 (Testimony of Defendant).

20.     Yoder and his family members arrived in the early morning hours of January 6, 2021, and parked their vehicle near the Capitol.  Tr. at 137 (Testimony of Special Agent Purcell); Tr. at 305 (Testimony of Defendant).

21.

    a.     <u>Government's Proposal</u>: Yoder was dressed in colonial attire in the style of George Washington, including a tri-corn hat, overcoat, cravat, vest, belts, pants, and boots.  GX 401, 405, 406, 407, 408, 409, 410, 411, 510, and 705; Tr. at 292-293, 337-338, 358 (Testimony of Defendant).  He carried an American flag on a staff and had a sword hanging in a scabbard at his belt.  Tr. at 337.  The sword was made of metal and had a point.  *Id.* at 337-338.  Yoder wore the costume on January 6, 2021, intending to send a message, in a nod to America's founding.  Tr. at 336-38.

    b.     <u>Defendant's Proposal</u>: Yoder was dressed in colonial attire in the style of George Washington, including a tri-corn hat, overcoat, cravat, vest, belts, pants, and boots.  GX 401, 405, 406, 407, 408, 409, 410, 411, 510, and 705; Tr. at 292-293, 337-338, 358 (Testimony of Defendant).  Yoder had an interest in the Revolutionary War since he was 11 years old and enjoys dressing in Revolutionary War garb when he "has an excuse to" do so. Tr. At 289, 294 (Testimony of Defendant). He would wear colonial garb often and would wear the attire for advertisement on

his company's website and at times during work. Tr. At 297-300, DX 15, 25. The specific attire

he was wearing on that day was one he wore for events. Id. At 294. He carried an American flag

on a staff and had a sword hanging in a scabbard at his belt.  Tr. at 337.  The sword was "a costume

sword" that was made of metal and had a point but could not cut.  Id. at 314, 337-338.

22.     Yoder separated from his family and went to an area near the Washington

Monument.  Yoder was aware that the area near the Ellipse where President Trump was speaking

had security.  Tr. at 137-38 (Testimony of Special Agent Purcell); Tr. at 346-347 (Testimony of

Defendant).  Yoder did not go into the secure area for the rally speech due to the items he carried.

*Id.*

23.     At some point during the rally, Yoder had a photo taken of him posing next to

another participant's sign at the rally when someone had asked him to do so.  Tr. at 347-348, GX

705.  The sign stated: "Subtract unverified votes dead people illegal votes China's 4 mil ballots

Trump wins."  *Id.*; *see also* Tr. at 348 (Testimony of Defendant).  Yoder agreed with the sentiment

of this sign.  Tr. at 348-349 (Testimony of Defendant).

24.     Prior to President Trump finishing his speech, Yoder saw a crowd of people making

their way to the Capitol.  Tr. at 138-39 (Testimony of Special Agent Purcell).  After the speech,

Yoder began to make his way back to the family vehicle.  He stopped to buy T-shirts along the

way. *Id.*

25.     When Yoder reunited with his family members, they informed him "there was

trouble up at the Capitol" and "obviously some sort of an altercation between police and people."

Tr. at 307-308 (Testimony of Defendant).  Yoder's family members were "distressed and upset."

Tr. at 139 (Testimony of Special Agent Purcell).  "One of [Yoder's] brothers had mentioned having

been hit by rubber bullets, and the other brother had mentioned about having pepper spray."  Tr.

at 139-140.  Yoder noticed that his niece and nephew were irritated from having been exposed to pepper spray.  *Id.*

26.     Yoder's brother told him "[i]t's bad" and "Pence folded."   Tr. at 308, 343 (Testimony of Defendant); Tr. at 188-189 (Testimony of Special Agent Purcell).  His brother also told him people had "broken into Capitol doors."  Tr. at 308 (Testimony of Defendant).

27.     In response, Yoder "immediately headed toward the Capitol."  Tr. at 140 (Testimony of Special Agent Purcell); Tr. at 343 (Testimony of Defendant admitting he decided to go to the Capitol after his brother told him "Pence folded.").  Yoder traveled in the opposite direction of the crowd, which was coming the other way and leaving the Capitol.  Tr. at 140 (Testimony of Special Agent Purcell).

28.

        a.     <u>Government's proposal</u>:   As he approached the Capitol, Yoder saw barricades, which he told FBI agents he interpreted "as a funnel to steer people toward the Capitol." Tr. at 140-41 (Testimony of Special Agent Purcell); Tr. at 311, 344-345 (Testimony of Defendant stating bike racks were "one of the things there").  Yoder went around the barricades and climbed scaffolding to make his way onto the West Front of the Capitol.  Tr. at 140-41, 176 (Testimony of Special Agent Purcell); Tr. at 353-354 (Testimony of Defendant admitting he climbed through scaffolding to enter the Capitol).

        b.     <u>Defendant's proposal</u>:  As he approached the Capitol, Yoder saw barricades, which he told FBI agents he interpreted "as a funnel to steer people toward the Capitol."  Tr. at 140-41 (Testimony of Special Agent Purcell); Tr. at 311, 344-345. Yoder also indicated that by the time that Yoder went to the Capitol, there were bike racks "all over the place" but they, nor any protective fencing, were not impeding or blocking the path that he took to get to the Capitol. Tr. At. 311 (Testimony of Defendant). Yoder also did not see any signs along his way, nor did he

encounter any officers telling him not to proceed to the Capitol. Tr. At. 311-312 (Testimony of Defendant).  Yoder went around the barricades and climbed scaffolding to make his way onto the West Front of the Capitol.  Tr. at 140-41, 176 (Testimony of Special Agent Purcell); Tr. at 353-354).  When Yoder was climbing the scaffolding, he did not see police fighting with the demonstrators. Tr. At 362 (Testimony of Defendant)

29.    Yoder entered the U.S. Capitol from the Upper West Terrace of the West Front through the Senate Wing Door at approximately 3:14 PM.  GX 201 (CCTV from Senate Wing Door); GX 304 (Compilation of Senate Wing Door Entry); Tr. at 73-74 (Testimony of Captain Ortega); Tr. at 163-165 (Testimony of Special Agent Purcell); Tr. at 240-241 (Testimony of Lieutenant Kelly).

30.

a.    Government's proposal:  As he entered the Senate Wing Door, Yoder saw broken glass and a broken door.  Tr. at 141 (Testimony of Special Agent Purcell); Tr. at 313 (Testimony of Defendant that he saw broken windows).  Yoder could see people climbing in and out of the windows next to the Senate Wing Door.  GX 201; Tr. at 114 (Testimony of Captain Ortega); Tr. at 363 (Testimony of Defendant).  He smelled pepper spray or tear gas.  Tr. at 341-342 (Testimony of Defendant).

b.    Defendant's proposal:  As he entered the Senate Wing Door, Yoder saw broken glass and a broken door, though he did not see anyone breaking those windows, or when the windows had been broken.  Tr. at 141 (Testimony of Special Agent Purcell); Tr. at 313 (Testimony of Defendant Yoder could see people climbing in and out of the windows next to the Senate Wing Door).  GX 201; Tr. at 114 (Testimony of Captain Ortega); Tr. at 363 (Testimony of Defendant).  He smelled pepper spray or tear gas.  Tr. at 341-342 (Testimony of Defendant).

31.

    a.   <u>Government's proposal</u>:  Yoder heard a loud beeping noise from the Senate Wing Door.  GX 401; Tr. at 106, 128-130 (Testimony of Captain Ortega).  He "figured [the sound] probably had something to do with what was going on at that entrance, the breach."   Tr. at 322-323, 362-363.

    b.   <u>Defendant's proposal</u>:  Yoder heard " a sort of a beeping" noise from the Senate Wing Door.  GX 401; Tr. at 106, 128-130 (Testimony of Captain Ortega), Tr. At 362 (Testimony of Defendant).  He "figured [the sound] probably had something to do with what was going on at that entrance, the breach" but did not know where the beeping was coming from.   Tr. at 322-323, 362-363.

32.    Nevertheless, Yoder "made his way in through where the doors had been broken open."  Tr. at 141-42 (Testimony of Special Agent Purcell).  He entered carrying the American flag and still had his costume sword hanging from his belt.  Tr. at 314 (Testimony of Defendant).

33.    The USCP officers in the Capitol at that time were outnumbered and overwhelmed and not in a position to prevent people from entering the building at the time Yoder entered.  Tr. at 76-77, 108 (Testimony of Captain Ortega); Tr. at 253-254, 264, 276-281 (Testimony of Lieutenant Kelly). When he entered, Yoder did see law enforcement officers, but none made contact with him, nor did any of them impede his progress  Tr. At 320 (Testimony of Defendant)

34.

    a.   <u>Government's Proposal</u>: Surveillance video does not show Yoder and law enforcement officers interacting when he entered the Capitol.  GX 201 (CCTV Video of Senate Wing Door Entry); GX 304 (Compilation of Senate Wing Door Entry); Tr. at 187-188 (Testimony of Special Agent Purcell).

b.    <u>Defense's Proposal</u>: Surveillance video does not show Yoder and law enforcement officers interacting when he entered the Capitol.  GX 201 (CCTV Video of Senate Wing Door Entry); GX 304 (Compilation of Senate Wing Door Entry); Tr. at 187-188 (Testimony of Special Agent Purcell). Yoder testified that he believed he could go in because order had been restored at that point and no officers impeded his progress, and the officers appeared to have set up lines to block people where they could not go. Tr. At 320 (Testimony of Defendant)

35.    Yoder stood on a broken piece of wooden furniture, swung his flag around, and yelled over the crowd noise: "We've been so weak.  We've lost any kind of credibility because all we ever do is cave.  We don't riot.  We don't do bad things.  We keep the law . . ..".  GX 304 (Compilation of Senate Wing Door Entry); GX 401 (Video of Yelling); Tr. at 142, 165-169 (Testimony of Special Agent Purcell); Tr. at 316-317, 340-341 (Testimony of Defendant).

36.

a.    <u>Government's Proposal</u>: Yoder testified that the references to "we" meant Trump supporters.  Tr. at 340-341

b.    <u>Defendant's Proposal</u>: Yoder testified that the references to "we" meant Trump supporters.  Tr. at 340-341. Yoder testified that he did this as a "desperate attempt to bring order out of chaos" and that he did not condone the actions of those who were rioting, but he felt ignored. Tr. At 318 (Testimony of Defendant).

37.

a.    <u>Government's proposal</u>:  Yoder then got down from the broken piece of furniture and traveled to the Crypt, an area of the Capitol located on first floor of the Capitol beneath the Rotunda. GX 203 and 204 (CCTV Videos from the Crypt); GX 405 and 406 (Getty Images photo in the Crypt); Tr. at 77-81, 120-21 (Testimony of Captain Ortega); Tr. at 143, 169-173 (Testimony of Special Agent Purcell).

b.    Defendant's proposal:   Yoder then got down from the broken piece of furniture and traveled to the Crypt, an area of the Capitol located on first floor of the Capitol beneath the Rotunda. GX 203 and 204 (CCTV Videos from the Crypt); GX 405 and 406 (Getty Images photo in the Crypt); Tr. at 77-81, 120-21 (Testimony of Captain Ortega); Tr. at 143, 169-173 (Testimony of Special Agent Purcell). He proceeded in that direction because that is where law enforcement was allowing people to go. Tr. At 319 (Testimony of Defendant). While he was walking around the Capitol, Yoder was not yelling, chanting, fist pumping, marching or waving his flag. Tr. At 321-322 (Testimony of Defendant).

38.

a.    Government's proposal:   During his time in the Crypt and throughout the day, photographs were taken of Yoder, and he posed for some of the pictures.  GX 405, 406, 407, 408, 409, 411 (Photos); Tr. at 143-44, 171-173 (Testimony of Special Agent Purcell).

b.    Defendant's proposal:  During his time in the Crypt and throughout the day, photographs were taken of Yoder, and he posed for a picture.  GX 405, 406, 407, 408, 409, 411 (Photos); Tr. at 143-44, 171-173 (Testimony of Special Agent Purcell).

39.

a.    Government's proposal:   Yoder exited the Capitol through the Senate Wing Door at approximately 3:33 p.m.  GX 202 (CCTV video from Senate Wing Door); GX 305 (Compilation of Senate Wing Door Exit); Tr. at 174-176 (Testimony of Special Agent Purcell).

b.    Defendant's proposal:   Yoder exited the Capitol through the Senate Wing Door at approximately 3:33 p.m.  GX 202 (CCTV video from Senate Wing Door); GX 305 (Compilation of Senate Wing Door Exit); Tr. at 174-176 (Testimony of Special Agent Purcell). When Yoder was directed by law enforcement officers to leave, he did so. Tr. At 323 (Testimony of Defendant).

14

40.

      a.    <u>Government's proposal</u>:  Yoder made his way back to the family vehicle and he and his family drove back to his home in Missouri.  Tr. at 144 (Testimony of Special Agent Purcell); Tr. at 327 (Testimony of Defendant).

      b.    <u>Defendant's proposal</u>:  Yoder made his way back to the family vehicle and he and his family drove back to his home in Missouri, in part because there was a curfew.  Tr. at 144 (Testimony of Special Agent Purcell); Tr. at 327 (Testimony of Defendant).

41.    On March 16, 2021, Yoder voluntarily agreed to be interviewed by FBI Special Agents at the Joplin Resident Agency in Joplin, Missouri.  Tr. at 135-36 (Testimony of Special Agent Purcell); Tr. at 329 (Testimony of Defendant).  FBI Special Agent Allen Purcell conducted the interview.  During the interview, Yoder admitted that he entered the Capitol on January 6, 2021.  Tr. at 136 (Testimony of Special Agent Purcell); Tr. at 331 (Testimony of Defendant).

42.    Yoder voluntarily gave FBI agents his telephone and some of the colonial attire he wore on January 6, 2021.  Tr. at 145-51 (Testimony of Special Agent Purcell); Tr. at 330-331 (Testimony of Defendant); GX 501 (Tri-corn Hat), 502 (Blue Overcoat), 503 (White Cravat), 504 (Tan Vest), 505 (Receipt for Property Form), 507 (Consent to Search Form), 511 (Compilation of Text Messages between Isaac Yoder and Kelly Yoder).

43.    Yoder admitted that around the same time as his voluntary interview with the FBI, he spoke with a reporter from Newsweek.  Tr. at 349-351 (Testimony of Defendant).  Yoder told the reporter that there "were people everywhere" in the Capitol.  He agreed that he told the reporter that "Most of us out there are on the side of the aisle who are the gun owners" and "If we had collectively gone there to cause trouble, there would have been piles of bodies."  Tr. at 349.  Yoder testified that he told the Newsweek reporter that he did not condone the damage that was done on January 6, but that it if it was the intention, it would make Trump supporters "the most pathetic

group of people."  Tr. at 350-351.  Yoder agreed he told the reporter from Newsweek that if Democrats were confident that Biden won fairly, they should have brought the issue before the Supreme Court to appease the naysayers.  Yoder told the reporter he was not concerned at that time about the potential for being criminally prosecuted for his actions on January 6, and said it was the "anarchy in government" that concerned him.  Tr. at 351.

44.     Yoder testified at trial that when he entered the Capitol, "it was very troubling, the whole situation" but he "put [] [his] trust in the discretion of law enforcement."  Tr. at 364 (Testimony of Defendant).  Yoder testified at trial that he did not see police officers and rioters fighting when he was climbing the scaffolding or on the West Front.  Tr. at 362-363.  Yoder claimed that when he entered the Capitol "[t]here was complete order in terms of police presence and --- the situation was very controlled."  Tr. at 315-316; 364-365

## DEFENDANT'S PROPOSED CONCLUSIONS OF LAW

a.     **Count One**

45.     Count One of the Second Superseding Information charges the defendant with entering or remaining in a restricted building or ground, in violation of 18 U.S.C. § 1752(a)(1). In order to find the defendant guilty of this offense, the Court must find that the government proved each of the following elements beyond a reasonable doubt: (1) that the defendant entered or remained in a restricted building or grounds without lawful authority to do so; and (2) that the defendant did so knowingly.  18 U.S.C. § 1752(a)(1); *United States v. Jabr*, 4 F.4th 97, 101 (D.C. Cir. 2021).

46.     The term "restricted building or grounds" means any posted, cordoned off, or otherwise restricted area of a building or grounds where a person protected by the Secret Service is or will be temporarily visiting. 18 U.S.C. § 1752(c)(1)(B).  The term "person protected by the Secret Service" includes the Vice President and the immediate family of the Vice President.  18

U.S.C. §§ 1752, 3056.  A person acts "knowingly" if he realizes what he is doing and is aware of the nature of his conduct, and does not act through ignorance, mistake, or accident. In deciding whether the defendant knowingly entered or remained in a restricted building, the Court may consider all of the evidence, including what the defendant did or said.  *See* The William J. Bauer Pattern Criminal Jury Instructions of the Seventh Circuit, 4.10 ("Definition of Knowingly"); *see also* Third Circuit Model Jury Instruction, Criminal, 5.02 ("Knowingly"); *see also Arthur Andersen LLP v. United States*, 544 U.S. 696, 705 (2005).

47.     First, the government proved, and Yoder agreed and did not dispute, that he entered or remained on the United States Capitol building and grounds, which was a restricted area on January 6, 2021.

48.     The testimony of Inspector Lanelle Hawa established that Vice President Michael Pence and members of his family—who were Secret Service protectees—were scheduled to, and in fact did, travel to the United States Capitol on January 6, 2021, in order for the Vice President to preside over the congressional certification of the 2020 Presidential election.  *See* Tr. 15, 20; GX 107.  The testimony of Inspector Lanelle Hawa and Captain Ronald Ortega further established that, in preparation for this event, the USSS and USCP adopted a restricted area around the U.S. Capitol Grounds that was closed to members of the public.  *See* Tr. at 18-20 (Hawa); Tr.at 49-52 (Ortega, noting that only members of Congress, congressional staff, Architect of the Capitol employees, and law enforcement were permitted inside the restricted area as of January 6, 2021); GX 104 (map of restricted area).  Captain Ortega described how, in the morning of January 6, 2021, the perimeter of the restricted area was delineated with bike racks and snow fencing with signage indicating that the area was closed.  *See* Tr. at 51-54; GX 105, 106.  He did testify, however, that he did not see how things appeared afterward. Tr. at 112. There were additional layers of barricades within the restricted area, including at the entrance to

the scaffolding on the west side of the Capitol, a construction zone for the Inaugural stage. *See* Tr. at 44; 123-125. Further, the Capitol building itself was closed to the public on January 6, 2021, as it had been for months prior. *See* Tr. at 48-50. However, Yoder testified that while proceeding to the Capitol, there were no barriers from him walking onto the grounds of the Capitol. Yoder did indeed see bike racks, but at that time, they were not organized as a barrier or impediment in any way . Tr. at 344, 357.

49.     The testimony of Special Agent Purcell, who recounted the defendant's interview statements that he passed around barricades and climbed scaffolding, and the testimony of the defendant himself, who testified similarly, establish that the defendant entered the restricted area in the afternoon on January 6, 2021. *See* Tr. 140-141, 176, 344-345, 353. Moreover, the same testimony and the video evidence introduced at trial, most notably the Capitol CCV footage, undisputedly establish that the defendant entered the U.S. Capitol building itself at 3:14 p.m. on January 6, 2021, and he remained inside for just under 20 minutes. *See* GX 304, 305. He remained inside until he complied with law enforcement's order to leave the Capitol. Tr. at 325-26.

50.     Second, the government has failed to prove beyond a reasonable doubt that the defendant knew that he was not permitted on the Capitol grounds or in the Capitol building itself.

51.     Before Yoder even entered the grounds, Yoder's own brothers told him that police were deploying tear gas and rubber bullets against rioters and that rioters had broken into the Capitol. *See* Tr. at 139-140 (Purcell); Tr. at 308 (Yoder). Yoder saw and passed bike racks and/or barricades that had been pushed aside by other rioters and at that time were not in any organized position or creating any impediment to proceed. Tr. at 140-41, 176 (Purcell); Tr. at 310 (Yoder). Yoder climbed scaffolding to reach the Upper West Terrace. Tr. at 176 (Purcell); Tr. at 353 (Yoder).

52.     When Yoder got to the Senate Wing Door, he saw that windows next to the door had been broken but did not see people breaking windows or busting down doors. Tr. at 313. Yoder did see that rioters had been entering the building through both the door and the windows. Tr. at 313 (broken windows), Tr. at 363-364 (rioters climbing through the window); *see also* Tr. at 141 (Purcell).  He also did not know when the windows had been broken or when or how the door was opened. Tr. at 313-14. However, Yoder saw that there was a "good police presence" and at that time, the police were in a "complete line" and that they had the situation under control. Tr. at 364.

53.     Yoder heard an alarm blaring, but it "wasn't very significant" as there was a lot of "competing noise." Tr. at 362. Captain Ortega testified that the crowd was loud as well. Tr. at 130. Yoder also did not know why there was an alarm going off. Tr. at 323. Yoder did smell some pepper spray or tear gas. Tr. at 342.

54.     Once inside the building, Yoder stood on a "pile of wood or what looks like maybe a table or something broken," in order to address other rioters.  Tr. at 316-17. Yoder indicated that he was trying to convey that the situation "isn't good" and the actions the rioters were taking would be "a stain on the movement" and that "we don't do this sort of thing." Tr. at 317. Yoder was trying to communicate that those who were supporting Trump are those who keep and respect the law and, Yoder was attempting "to try to bring order out of chaos" that was occurring. Tr. at 317-18.

55.     Yoder was carrying a metal costume sword and a flag on a large flagpole, which would not have been permitted in the Capitol even if it were open to the public—and which Yoder did not bring into the secure perimeter for President Trump's rally earlier that day.  *See* Tr. at 81-83, 112 (Ortega); Tr. at 137-138 (Purcell); Tr. at 346-347 (Yoder). However, at no time did any police officer tell him to leave because he had a flag or had a costume sword. Tr. at 265.

19

Yoder was also looking for "cues" to determine what he could do and not do, as he was relying on them to indicate what he could and could not do, and he did not perceive any law enforcement officer suggesting he could not proceed. Tr. at 319-20. GX 201. In fact, Lieutenant Dennis Kelly, who at one point was within arm's length of Yoder in one of the videos, made no attempt to stop Yoder from proceeding, or said anything to Yoder. Tr. at 269 There was also no signage stating that Yoder could not have either the costume flag or sword in the Capitol. Tr. at 268-69.

56.     While Yoder and the rioters may not have been permitted to be in the Capitol at that time, he was not given any affirmative indication he could not be inside. There were no signs at the door Yoder entered indicating he could not enter, and, despite considerable police presence, Yoder was not informed he could not enter or be in the Capitol – until he was informed by police he had to leave, which he did. Tr. at 325-26.

57.     Accordingly, Yoder's testimony that he believed that he was permitted to be in the Capitol at that time is reasonable. While indeed there was a chaotic situation in other areas of the Capitol, things were more orderly in the area in which Yoder entered. Tr. at 260-61.There was a significant police presence that seemed by their positioning to be directing people entering the building to head in a certain direction as they were coming in a "nonviolent fashion." Tr. at 262. The police presence also did not prevent Yoder or other people from entering despite the fact that there were officers present when he entered. Tr. at 320. While there was some indication that there had been the use of pepper spray, Yoder testified that he saw the use of pepper spray, but from the rioters and not police. Tr. at 259.

58.     Accordingly, while the government's evidence has proven that Yoder entered or remained in a restricted building without lawful authority to do so, it has failed to prove beyond a reasonable doubt that Yoder did so knowingly.   Therefore, the Court therefore finds that the Government has failed to meet its and finds Defendant NOT GUILTY on Count 1.

**B.**     **Count Two**

59.     Count Two of the Second Superseding Information charges the defendant with disorderly or disruptive conduct in a restricted building or grounds, in violation of 18 U.S.C. § 1752(a)(2).  In order to find the defendant guilty of this offense, the Court must find that the government proved each of the following elements beyond a reasonable doubt: (1) that the defendant engaged in disorderly or disruptive conduct in, or in proximity to, any restricted building or grounds; (2) that the defendant did so knowingly, and with the intent to impede or disrupt the orderly conduct of Government business or official functions; and (3) that the defendant's conduct occurred when, or so that, his conduct in fact impeded or disrupted the orderly conduct of Government business or official functions.

60.     The terms 'disorderly' and 'disruptive' have their plain meanings. "'Disorderly' conduct is that which 'tends to disturb the public peace, offend public morals, or undermine public safety.' Conduct is 'disruptive' if it 'tend[s] to disrupt some process, activity, condition, etc.'" *United States v. Rivera*, 607 F. Supp. 3d 1, 8 (D.D.C. 2022) (quoting "Disorderly," Black's Law Dictionary (9th ed. 2009); "Disorderly," Oxford English Dictionary (2nd ed. 1989); "Disruptive," Merriam-Webster.com Dictionary (June 16, 2022)); *see also United States v. Grider*, No. CR 21-022 (CKK), 2022 WL 17829149, at *12 (D.D.C. Dec. 21, 2022) (same).

61.     Yoder's conduct within the Capitol cannot be described as either disorderly or disruptive.

62.     In *Rivera*, the court found that "mere presence in an unlawful mob or riot is both (1) 'disorderly' in the sense that it furthers the mob's 'disturb[ing] the public peace' and (2) 'disruptive' insofar as it disturbs the normal and peaceful condition of the Capitol grounds and buildings, its official proceedings, and the safety of its lawful occupants." *Rivera*, 607 F. Supp.

3d at 8; *see also* ECF No. 81 at 404, *Brock*, 21-cr-140-JDB; ECF No. 106 at 46-47, *United States v. Fitzsimons*, 21-cr-158-RC (D.D.C. Oct. 27, 2022) (both agreeing)."

63.     In this case, while there were rioters inside the Capitol building, including non-violent rioters like Yoder, his  actions do not rise to a level to be considered either disorderly or disruptive. To the contrary, Yoder sought to discourage the disorderly and disruptive conduct of others. Yoder's comments made to the rioters present in the Capitol, sought to discourage the acts of others. While he was not a law enforcement official, his actions of condemning the acts of the rioters, was for the purpose of making things more orderly and eliminating the disruption being caused by the others present at the time. Further, neither his form of entry into the Capitol, walking around the Capitol peaceably, and his exit upon being asked to leave, further support that Yoder's actions were neither disorderly nor disruptive in his time within the Capitol.

64.     While Yoder was inside the Capitol, Yoder walked around the hallways and Crypt for a limited period of time. Yoder followed what he understood to be the orderly "flow" of the individuals within the Capitol. He followed all police directions provided to him, both explicitly and implicitly, and exited upon being instructed by law enforcement personnel.  Accordingly, the government has failed to established that Yoder's conduct inside the Capitol and its grounds was either disorderly or disruptive.

65.     Second, while Yoder did knowingly enter the Capitol, it was not with the intent to impede or disrupt the orderly conduct of Government business or official functions.

66.     The law permits the factfinder to infer that a person intends the natural and probable consequences of their actions.  *See United States v. Mejia*, 597 F.3d 1329, 1341 (D.C. Cir. 2010) (cited in *Rivera*, 607 F. Supp. 3d at 8; *Grider*, 2022 WL 17829149, at *12).  "The probable and natural consequence of breaking into the United States Capitol is the disruption of Congressional business and proceedings." *Rivera*, 607 F. Supp. 3d at 8; *see also* ECF No. 81 at 397, *Brock*, 21-

cr-140-JDB; ECF No. 106 at 47, *Fitzsimons*, 21-cr-158-RC. However, as Yoder did not break into the Capitol, but rather came into the Capitol over supervision and implicit consent by law enforcement by failing to stop him, as well as his intent to discourage others from rioting and/or acting disorderly or disruptive, Yoder was not one of the individuals who was disrupting the proceedings.

67.     Yoder testified that he knew that the certification of the election was supposed to take place at the Capitol that day, however, Yoder was not in a situation where he was forcing himself into the Capitol.  Tr. at 305; *see also* ECF No. 81 at 405-406, *Brock*, 21-cr-140-JDB (pointing to awareness of the certification, the mob, and clashes with law enforcement). However, at the time of his entrance, he believed the certification of the election had already concluded. Tr. at 308.

68.     Further, at the time that Yoder headed to the Capitol, he did not have any intention to disrupt any proceedings, as he was under the impression that the electoral vote had been completed. Yoder also told FBI Special Agent Allen Purcell  that he headed to the Capitol because he wanted to help if there were people who needed to be helped. Tr. at 140. Additionally, as Yoder indicated in his testimony, stated that, "My brother…said 'Pence folded,' giving me the impression that everything is done in terms of government business." Tr. at 308. He wanted to go to the Capitol to "try to assess the situation." Tr. at 308-09.

69.     Once inside, Yoder told other rioters, "We've been so weak. We've lost any type of credibility because all we ever do is cave.  We don't riot.  We don't do bad things.  We keep the law."  *See* GX 401; Tr. at 340-341.  Yoder admitted that by "we," he meant "Trump supporters."  Tr. at 340. Therefore, Yoder was attempting to discourage others from being disorderly or disruptive.

70.     After the events of January 6, 2021, Yoder also told a reporter from Newsweek that he did not condone the damage that was done. Tr. at 351. He also voluntarily cooperated with law enforcement, meeting with an FBI officer and providing evidence such as items Yoder had with him on January 6. Tr. 134-36, 144-48 (FBI Agent Purcell testimony) Tr. at 324, 328 (Yoder testimony).

71.     While Yoder did indeed enter the U.S. Capitol, it is not clear beyond a reasonable doubt, that Yoder's words and actions was to protest and disrupt Congressional proceedings around the certification of the 2020 Presidential Election. Indeed, the only words that Yoder is seen to be doing were seeking to quell the rioters in the building. See GX 401, Tr. at 316-317, 340-341 (testimony of Defendant stating "We've been so weak.  We've lost any kind of credibility because all we ever do is cave.  We don't riot.  We don't do bad things.  We keep the law . . ..").

72.     Third, Yoder's presence in the Capitol in fact disrupted the certification as his actions sought to reduce, rather than increase the disruption caused by the rioters.

73.     As the testimony of Inspector Hawa, Captain Ortega, and Lieutenant Kelly amply demonstrated, and the defense does not dispute, that the certification stopped when the rioters breached the Capitol and could not resume until the building had been cleared hours later.  *See* Tr. at 28-30 (Hawa describing the certification as it related to VP Pence); Tr. at 69-70, 98-99 (Ortega describing evacuation of Congress); Tr. at 251-252 (Kelly describing the efforts to clear the building so Congress could resume).  However, Yoder's involvement was one of attempting to assist law enforcement by encouraging rioters to stop rioting.

74.     However, the Court finds that the evidence shows fails to show beyond a reasonable doubt that Yoder knowingly, and with the intent to impede or disrupt the orderly conduct of Government business, engaged in disorderly or disruptive conduct in, or in proximity to, any restricted building that in fact impeded or disrupted the orderly conduct of Government

business or official functions.  The Court therefore finds the Defendant NOT GUILTY on Count 2.

      **C.**    <u>**Count Three**</u>

75.    Count Three of the Second Superseding Information charges the defendant with violent entry and disorderly and disruptive conduct in a Capitol Building, in violation of 40 U.S.C. § 5104(e)(2)(D).  In order to find the defendant guilty of this offense, the Court must find that the government proved each of the following elements beyond a reasonable doubt: (1) that the defendant engaged in disorderly or disruptive conduct in any of the United States Capitol Buildings; (2) that the defendant did so with the intent to impede, disrupt, or disturb the orderly conduct of a session of Congress or either House of Congress; and (3) that the defendant acted willfully and knowingly.

76.    The term "United States Capitol Buildings" includes the United States Capitol located at First Street, Southeast, in Washington, D.C.  *See* 40 U.S.C. § 5101.   A person acts "willfully" if he acts with the intent to do something that the law forbids, that is, to disobey or disregard the law.  "Willfully" does not, however, require proof that the defendant be aware of the specific law or rule that his conduct may be violating.  *See United States v. Bryan*, 524 U.S. 184, 190 (1998)*; see also United States v. Burden*, 934 F.3d 675, 680 (D.C. Cir. 2019) (to act "willfully and knowingly" is to be "aware of and knowingly violate[ ] [a] legal obligation not to commit the charged actus reus").

77.    For the same reasons as described in Count 2, Yoder's conduct inside the Capitol was neither disruptive nor disorderly.

78.    For the same reasons as described in Count 2, the government has failed to prove that Yoder acted with either the intent to impede, disrupt, or disturb the orderly conduct of a session of Congress or either House of Congress.

79.     Yoder acted neither willfully seeking to violate the law, nor was he not acting knowingly in violation of the law.

80.     The testimony showed that Yoder went to the Capitol after having heard that Pence folded, and that the electoral college had already been concluded. Yoder, almost immediately upon entering, attempted to discourage people from rioting, stating: "We've been so weak.  We've lost any kind of credibility because all we ever do is cave.  We don't riot.  We don't do bad things.  We keep the law . . ..".  GX 304 (Compilation of Senate Wing Door Entry); GX 401 (Video of Yoder addressing the rioters)

81.     Accordingly, the Court concludes that the government has failed to prove that Yoder did not act willfully in violation of the law, or he was acting knowingly in violation of the law.

82.     The Court therefore finds Defendant NOT GUILTY on Count 3.

**D.**     **<u>Count Four</u>**

83.     Count Four of the Second Superseding Information charges the defendant with parading, demonstrating, or picketing in a Capitol Building, in violation of 40 U.S.C. § 5104(e)(2)(G).  In order to find the defendant guilty of this offense, the Court must find that the government proved each of the following elements beyond a reasonable doubt (1) that the defendant paraded, demonstrated, or picketed in any of the United States Capitol Buildings; (2) that the defendant acted willfully and knowingly.

84.     To "parade" means to take part in "[a] march or procession, organized on a grand scale, in support of some political object." *Rivera*, 607 F. Supp. 3d at 10 (citing Oxford English Dictionary (2nd ed. 1989)); *see also* "Parade," Merriam-Webster.com Dictionary (June 16, 2022) ("to march in or as if in a procession").  The term "demonstrate" refers to conduct that would disrupt the orderly business of Congress by, for example, impeding or obstructing passageways,

hearings, or meetings, but does not include activities such as quiet praying. *Bynum v. United States Capitol Police Board*, 93 F. Supp. 2d 50, 58 (D.D.C. 2000); *see also* ECF No. 81 at 412, *Brock*, 21-cr-140-JDB; *See also Rivera*, 607 F. Supp. 3d at 10 (providing one definition for "demonstrating" as taking place in "[a] public manifestation, by a number of persons, of interest in some public question, or sympathy with some political or other cause; usually taking the form of a procession and mass-meeting.").

85.     Yoder entered into the Capitol, but he neither paraded, demonstrated, or picketed while in the Capitol building. None of the video captured Yoder either waving his flag, pumping his fist, joining the rioters in any chanting, or acting in any way that appeared that he was parading, demonstrating, or picketing.

86.     Yoder testified that his colonial garb was not for the purpose of making a political statement other than general support of the United States and his patriotism. Tr. at 303. Yoder's use of colonial garb, which he regularly wore since his youth, was common for him and his family, and would wear it on different occasions. Tr. at 294-97. Yoder would also wear the colonial attire as part of his locksmith business, and it was part of his branding, even wearing such attire on his locksmith company's website. Tr. at 297-300.

87.     The evidence shows that while Yoder was in Colonial Era clothing, his purpose in that attire was not one for the purpose of parading, demonstrating, or picketing. Yoder was not seeking to make any political statement during his entry into the Capitol. He was neither marching nor was he seeking to disrupt the orderly business of Congress by his actions. To the contrary, it appears that the only audio of Yoder's action sought to discourage others from parading, demonstrating, or picketing. Further, at the time of his entry, he was under the belief that the electoral college process had been completed.

88.     Therefore, the Court finds that Yoder was neither parading, demonstrating, or picketing.

89.     For the reasons discussed in Count 1, the government has failed to prove that Yoder willfully and knowingly knew that he was not allowed to be inside the U.S. Capitol.

90. Accordingly, the Court finds the Defendant NOT GUILTY on Count 4.


                                                  Respectfully submitted,


ISAAC YODER                                       MATTHEW M. GRAVES
By Counsel                                        UNITED STATES ATTORNEY
                                                  D.C. Bar Number 481052


*/s/ John L. Machado*                             By:     */s/ Sarah W. Rocha*
JOHN L. MACHADO, ESQ.                             SARAH W. ROCHA
Counsel for Isaac Yoder                           Trial Attorney / Detailee
Bar No. 449961                                    D.C. Bar No. 977497
503 D Street, NW, Suite 310                       219 S. Dearborn Street, Fifth Floor
Washington, DC 20001                              Chicago, Illinois 60604
(703) 989-0840                                    (202) 330-1735
johnlmachado@gmail.com                            sarah.wilsonrocha@usdoj.gov

                                                  MICHAEL L. BARCLAY
                                                  Assistant United States Attorney
                                                  Member of N.Y. Bar
                                                  U.S. Attorney's Office for the District of
                                                  Columbia
                                                  601 D Street, NW
                                                  Washington, D.C. 20530
                                                  (202) 252-7669
                                                  Michael.Barclay@usdoj.gov