## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **UNITED STATES OF AMERICA** | |
| **v.** | |
| **ISAAC SAMUEL YODER,** | **Case No. 1:21-cr-505-RCL** |
| *Defendant.* | |

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

A two-day bench trial in this criminal matter was held on March 20 and 21, 2023. The Government charged Defendant Isaac Samuel Yoder by information with four misdemeanor counts: (1) Entering and Remaining in a Restricted Building, in violation of 18 U.S.C. § 1752(a)(1); (2) Disorderly and Disruptive Conduct in a Restricted Building, in violation of 18 U.S.C. § 1752(a)(2); (3) Violent Entry and Disorderly Conduct in a Capitol Building, in violation of 40 U.S.C. § 5104(e)(2)(D); and (4) Parading, Demonstrating, or Picketing in a Capitol Building, in violation of 40 U.S.C. § 5104(e)(2)(G). Second Superseding Information, ECF No. 32. In support of its case, the Government introduced testimony from four witnesses: (1) Inspector Lanelle Hawa of the United States Secret Service ("USSS"); (2) Captain Ronald Ortega of the United States Capitol Police ("USCP"); (3) former Federal Bureau of Investigation ("FBI") Special Agent Allen Purcell; and (4) former Lieutenant Dennis Kelly of the USCP. Yoder testified in support of his case but did not present any other witnesses. Additionally, the Court admitted into evidence 42 Government exhibits (including one stipulation between the parties) and ten Defense exhibits.

Below are the Court's findings of fact and conclusions of law. Except where otherwise noted, the Court considers the evidence recounted below to be undisputed and/or unrebutted. For the reasons that follow, the Court finds Yoder **GUILTY** on all counts.

## I.    FINDINGS OF FACT

### A.    The Attack at the U.S. Capitol on January 6, 2021

The U.S. Capitol is located at First Street between Independence Avenue and Constitution Avenue, in Washington, D.C. *See* Tr. at 55 (Testimony of Captain Ortega). The Capitol was closed to the public at the beginning of the COVID-19 pandemic in March 2020 and remained closed on January 6, 2021. *Id.* at 49–50. On January 6, 2021, the west side of the U.S. Capitol contained scaffolding where a stage was under construction for the upcoming Inauguration. Government's Exhibit ("GX") 109 (Rendering of Capitol with Inauguration Stage); Tr. at 44–46 (Ortega).

In preparation for then-Vice President Michael R. Pence's visit to preside over the certification of the votes of the Electoral College on January 6, 2021, the USSS collaborated with the USCP to adopt a security perimeter around the exterior plaza of the Capitol. GX 104 (Perimeter Map); GX 107 (USSS Worksheet); Tr. at 14–20 (Testimony of Inspector Hawa). Multiple levels of restrictions around the Capitol included an outer perimeter around the Capitol Complex with snow fencing and/or bike racks. Tr. at 49–56 (Ortega). There were signs posted on the perimeter of the Capitol stating "Area Closed by Order of the United States Capitol Police Board." GX 105, 106 (Area Closed Signs); Tr. at 38 (Hawa); Tr. at 51–54 (Ortega). Inside the outer perimeter, there was another area of bike racks and signs, and the scaffolding on the Upper West Terrace also had additional barriers. Tr. at 49–56, 111–12, 122–25 (Ortega). Only authorized people with appropriate identification were allowed access inside the Capitol, and those persons were required to submit to security screening. *Id.* at 48–49, 81–83 (Ortega); *id.* at 242–44 (Testimony of Lieutenant Kelly). Items that could be used as weapons, such as swords or flagpoles, were not permitted inside the Capitol building. *Id.* at 81–83, 112 (Ortega).

On January 6, 2021, a joint session of the United States Congress convened at the Capitol. GX 301 (Montage of Video Footage from the U.S. House and Senate); GX 601 (Joint Stipulations).

During the joint session, elected members of the United States House of Representatives and the United States Senate met in separate chambers of the Capitol to certify the vote count of the Electoral College of the 2020 Presidential Election, which had taken place on Tuesday, November 3, 2020. GX 601. The certification of the Electoral College vote count amounted to "Government business or official functions" as those terms are used in 18 U.S.C. § 1752(a)(2). GX 601. It also amounted to a "session of Congress or either House of Congress," and a "hearing before, or . . . deliberations of, a committee of Congress or either House of Congress," as those terms are used in 40 U.S.C. § 5104(e)(2)(D). GX 601. Vice President Pence, accompanied by his wife and their daughter, as well as his security detail, staff, and additional personnel, traveled to the Capitol on January 6, 2021 to attend the joint session. Tr. at 20 (Hawa).

The joint session began at approximately 1:00 p.m., as required. GX 301; GX 601; Tr. at 20–22 (Hawa); U.S. Const., amend. XII ("The President of the Senate shall, in the presence of the Senate and House of Representatives, open all the certificates and the votes shall then be counted"); 3 U.S.C. § 15 ("Congress shall be in session on the sixth day of January succeeding every meeting of the electors. The Senate and House of Representatives shall meet in the Hall of the House of Representatives at the hour of 1 o'clock in the afternoon on that day, and the President of the Senate shall be their presiding officer."). At approximately 1:15 p.m., the House and Senate adjourned to separate chambers to resolve a particular objection. Tr. at 21 (Hawa). Vice President Pence was present and presiding, first in the joint session, and then in the Senate chamber. *Id.*; GX 301; GX 601.

As the proceedings continued in both the House and the Senate, and with Vice President Pence present, a large crowd gathered outside the Capitol. GX 303A (Video Compilation); Tr. at 22–24 (Hawa); Tr. at 56–57 (Ortega). Temporary and permanent barricades, as noted above, were in place around the exterior of the Capitol, and USCP officers were present and attempting to keep the crowd away from the Capitol Building and the proceedings underway inside. GX 303A; Tr. at 56–

58, 85–87 (Ortega).  By approximately 1:15 p.m., members of the crowd had penetrated the outer perimeter and began congregating on the west front of the Capitol.  Tr. at 22– 24 (Hawa).

Around 2:00 p.m., certain individuals in the crowd forced their way through and inside the barricades.  GX 303A; Tr. at 57–59 (Ortega).  U S C P  officers were forced to retreat and the crowd advanced to the exterior façade of the building.  GX 303A; Tr. at 65–66 (Ortega).  The crowd was not lawfully authorized to enter or remain in the building; had they been permitted to enter, prior to entering the building, members of the crowd would have been required to submit to security screenings and/or weapons checks as required by USCP officers or other authorized security officials.  Tr. at 81–83 (Ortega); id. at 276 (Kelly).  At the time that the crowd entered, the certification proceedings were still underway, and the exterior doors and windows of the Capitol were locked or otherwise secured as the facility had been placed in a lockdown due to the presence of the crowd at the immediate exterior of the building.  Tr. at 68–70 (Ortega); id. at 22–24 (Hawa).

Members of the USCP attempted to maintain order and keep the crowd from entering the Capitol; however, at approximately 2:13 p.m., certain individuals in the crowd forced their way into the Capitol, including by breaking windows and by assaulting members of law enforcement, as others in the crowd encouraged and assisted those acts.  GX 303A; Tr. at 89–93 (Ortega).  The West Front of the Capitol outside of the Senate Wing Door was an area of "melee."  Tr. at 278 (Kelly).  The Senate Wing Door is a fire exit located on the first floor of the Capitol.  GX 102 (U.S. Capitol Floor Plan – Floor 1); Tr. at 70–71, 73 (Ortega); Tr. at 240–41 (Kelly).  It is used only during emergency situations and emits "a very loud beeping noise" when opened.  Tr. at 71 (Ortega).  At approximately 2:13 p.m., members of the crowd breached the Senate Wing Door and windows on both sides of the Senate Wing Door.  GX 303A; Tr. at 90–95 (Ortega).

At approximately 2:20 p.m., members of the House of Representatives and of the Senate, including the President of the Senate, Vice President Pence, were instructed to—and did—evacuate

the chambers. GX 108 (Video of Pence Evacuation); Tr. at 24–26 (Hawa); GX 601. Accordingly, all proceedings of the United States Congress, including the joint session, were effectively suspended until shortly after 8:00 PM on January 6, 2021. GX 601.

In light of the circumstances caused by the unlawful entry to the Capitol—including the potential danger posed by unauthorized individuals who may have weapons—Congressional proceedings could not resume until after every unauthorized occupant had been removed from or left the Capitol, and law enforcement confirmed that the building was secured. Tr. at 29–30 (Hawa); *id.* at 70 (Ortega); *id.* at 250–52, 279 (Kelly). The proceedings resumed at approximately 8:00 p.m. after the building had been secured. GX 601. Vice President Pence remained in the Capitol complex from the time he was evacuated from the Senate Chamber until the session resumed. Tr. at 27–29 (Hawa).

### B.    Yoder's Participation in the January 6, 2021 Capitol Riot

Isaac Samuel Yoder, age 34, resides in Nevada, Missouri, is self-employed as a locksmith, and has been the owner of Yoder Lock & Key since 2014. Tr. at 286–87 (Testimony of Isaac Samuel Yoder). He has been married for ten years and has three children. *Id.* at 291–92.

Yoder traveled with his father, three of his brothers, his sister-in-law, his niece, and his nephew from Missouri to Washington, D.C. to attend a rally in support of then-President Donald J. Trump. *Id.* at 136–37 (Testimony of Special Agent Purcell); *id.* at 305 (Yoder). Yoder testified that he "was excited" about the rally because "President Trump was calling the people to come." *Id.* at 304–05 (Yoder). He further testified that when he decided to attend, he believed the event could not be construed as "something fringe" or that things could go wrong, because it was the President leading the event. *Id.* at 304. Yoder and his family members arrived in the early morning hours of January 6, 2021 and parked their vehicle near the Capitol. *Id.* at 137 (Purcell); *id.* at 305 (Yoder).

Yoder was dressed in colonial attire in the style of George Washington, including a tri-corn hat, overcoat, cravat, vest, belts, pants, and boots. GX 401 (Video of Yoder Speaking Inside the

Capitol); GX 405–11 (Photos of Yoder Inside the Capitol); GX 510 (Photo of Yoder With Another Person in Costume); GX 705 (Screenshot of Photo of Yoder at Rally); Tr. at 292–93, 337–38, 358 (Yoder). He carried an American flag on a pole and had a sword hanging in a scabbard at his belt. Tr. at 337 (Yoder); GX 405–11. The sword was made of metal and had a point. Tr. at 337–38 (Yoder). Yoder has had an interest in the Revolutionary War since he was 11 years old and enjoys dressing in Revolutionary War garb when he has an "excuse" to do so. *Id.* at 289, 294 (Yoder). He has worn historical costumes often, including for an advertisement on his company's website and at times during work. *Id.* at 297–300 (Yoder); Defense Exhibit ("DX") 15 (Screenshot of Photo and Social Media Post); DX 25 (Screenshot of Yoder Lock & Key Website). The specific attire he was wearing on January 6, 2021 was one he wore for events. Tr. at 294 (Yoder). Some of those events were political in nature, such as a rally in Missouri's capital that Yoder attended to protest that state's stay-at-home order in the early stages of the COVID-19 pandemic. *Id.* at 294–95, 338–39. Yoder wore the costume on January 6, 2021 intending to send a message, in a nod to America's founding. *Id.* at 338.

Yoder separated from his family and went to an area near the Washington Monument. Tr. at 137–38 (Purcell); *id.* at 346–47 (Yoder). Yoder was aware that the area near the Ellipse, where President Trump was speaking, had security. Tr. at 137–38 (Purcell); *id.* at 346–47 (Yoder). Yoder did not go into the secure area for the rally speech due to the items he carried. *Id.* at 346–47 (Yoder). At some point during the rally, Yoder had a photo taken of him posing next to another participant's sign at the rally when someone had asked him to do so. *Id.* at 347–48; GX 705. The sign stated: "SUBTRACT UNVERIFIED VOTES DEAD PEOPLE ILLEGAL VOTES CHINA'S 4 MIL BALLOTS TRUMP WINS." GX 705; *see also* Tr. at 348 (Yoder). Yoder agreed with the sign's sentiment. Tr. at 348–49 (Yoder). Prior to President Trump finishing his speech, Yoder saw a crowd

of people making their way to the Capitol. Tr. at 138–39 (Purcell). After the speech, Yoder began to make his way back to the family vehicle, stopping to buy T-shirts along the way. *Id.*

When Yoder reunited with his family members, they informed him "there was trouble up at the Capitol" and "obviously some sort of an altercation between police and people." *Id.* at 307–08 (Yoder). Yoder's family members were "distressed and upset." *Id.* at 139 (Purcell). "One of [Yoder's] brothers had mentioned having been hit by rubber bullets, and the other brother had mentioned about having pepper spray." *Id.* at 139–40. Yoder noticed that his niece and nephew were irritated from having been exposed to pepper spray. *Id.* at 140. Yoder's brother told him "[i]t's bad" and "Pence folded." *Id.* at 308, 343 (Yoder); *id.* at 188–89 (Purcell). His brother also told him people had "broken into Capitol doors." *Id.* at 308 (Yoder).

In response, Yoder "immediately headed toward the Capitol." *Id.* at 140 (Purcell); *id.* at 343 (Yoder). Yoder traveled in the opposite direction of the crowd, which at the time was leaving the Capitol. *Id.* at 140 (Purcell). As he approached the Capitol, Yoder saw barricades, which he told FBI agents he interpreted "as a funnel to steer people toward the Capitol." *Id.* at 140–41 (Purcell); *id.* at 311, 344–45 (Yoder). Yoder testified, however, that he did not see any signs along his way, nor did he encounter any officers expressly telling him not to proceed to the Capitol. *Id.* at. 311–12 (Yoder). Yoder went around the barricades and climbed scaffolding to make his way onto the West Front of the Capitol. *Id.* at 140–41, 176 (Purcell); *id.* at 353–54 (Yoder). Yoder testified that it did not occur to him that members of the general public were not permitted to climb the scaffolding, *id.* at 353–55 (Yoder), but the Court does not credit that testimony.

Yoder entered the Capitol Building from the Upper West Terrace of the West Front through the Senate Wing Door at approximately 3:14 PM. GX 201 (Closed-Circuit Video ("CCV") from Senate Wing Door); GX 304 (Compilation of Senate Wing Door Entry); Tr. at 73–74 (Ortega); Tr. at 163–65 (Purcell); Tr. at 240–41 (Kelly). As he entered the Senate Wing Door, Yoder saw broken

glass and a broken door. Tr. at 141 (Purcell); *id.* at 313 (Yoder). Yoder could see people climbing in and out of the windows next to the Senate Wing Door. GX 201; Tr. at 114 (Ortega); Tr. at 363–64 (Yoder). He smelled pepper spray or tear gas. Tr. at 341–42 (Yoder). Yoder heard a loud beeping noise from the Senate Wing Door. GX 401; Tr. at 106, 128–30 (Ortega); Tr. at 322–23, 362 (Yoder). He "figured [the sound] probably had something to do with what was going on at that entrance, the breach." Tr. at 322–23, 362–63 (Yoder). Nevertheless, Yoder "made his way in through where the doors had been broken open." *Id.* at 141–42 (Purcell). He entered the Capitol carrying the American flag and still had his costume sword hanging from his belt. *Id.* at 314 (Yoder).

Yoder testified at trial that when he entered the Capitol, "it was very troubling, the whole situation," but he "put[] [his] trust in the discretion of law enforcement." *Id.* at 364. Yoder further testified at trial that he did not see police officers and rioters fighting when he was climbing the scaffolding or on the West Front. *Id.* at 362–63. Yoder claimed that when he entered the Capitol "[t]here was complete order in terms of police presence and—the situation was very controlled." *Id.* at 315–16, 364–65. However, the evidence presented at trial demonstrated that the USCP officers in the Capitol at that time had not simply decided to allow the crowd to run amok through the building—they were outnumbered, overwhelmed, and not in a position to prevent people from entering the building at the time Yoder entered. *I d .* at 76–77, 108 (Ortega); *id.* at 253–54, 264, 276–81 (Kelly).

When he entered, Yoder saw law enforcement officers, but none made contact with him, nor did any of them impede his progress Tr. at 320 (Yoder); GX 201; GX 304; Tr. at 187–88 (Purcell). Yoder testified that he believed he could go in because it appeared to him that order had been restored at that point, no officers impeded his progress, and the officers appeared to have set up lines to block people where they could not go. Tr. at 320 (Yoder). However, in light of the undisputed evidence that Yoder saw barricades on his way to the Capitol, and that, once he arrived, he saw others entering through broken windows, heard a siren blaring, and smelled pepper spray or tear gas, the Court does

not credit Yoder's testimony that he believed himself to be permitted in certain areas simply because law enforcement officers were not actively stopping him from doing so.

Shortly after entering the building, Yoder climbed atop a pile of broken wooden furniture, swung his flag around, and yelled over the crowd noise: "We've been so weak. We've lost any kind of credibility because all we ever do is cave. We don't riot. We don't do bad things. We keep the law". GX 304; GX 401; Tr. at 142, 165–69 (Purcell); Tr. at 316–17, 340–41 (Yoder). Yoder testified that the references to "we" meant Trump supporters. Tr. at 340–41 (Yoder). Yoder testified that he did this as a "desperate attempt to bring order out of chaos" and that he did not condone the methods of those who were rioting, but he felt ignored. *Id.* at 318. However, to the extent that Yoder's testimony suggests he did not understand himself to be joining the crowd within the Capitol to protest the election results, the Court does not credit that testimony, particularly in light of the actions he took next.

Following his speech, Yoder got down from the broken pile of furniture and traveled to the Crypt, an area of the Capitol located on first floor of the Capitol beneath the Rotunda. GX 203 (CCV from the Crypt); GX 204 (same); GX 405; GX 406; Tr. at 77–81, 120–21 (Ortega); *Id.* at 143, 169–73 (Purcell). During his time in the Crypt and throughout the day, photographs were taken of Yoder, and he posed for at least one of the pictures. GX 405–09, 411; Tr. at 143–44, 171–73 (Purcell).

After circulating around the Crypt for some time, Yoder encountered a USCP officer who expressly asked him to leave, a request with which Yoder complied. Tr. at 323–24 (Yoder). Yoder exited the Capitol through the Senate Wing Door at approximately 3:33 p.m. GX 202 (CCV from Senate Wing Door); GX 305 (Compilation of Senate Wing Door Exit); Tr. at 174–76 (Purcell). Yoder made his way back to the family vehicle and he and his family drove back to his home in Missouri. Tr. at 144 (Purcell); *Id.* at 327 (Yoder).

On March 16, 2021, Yoder voluntarily agreed to be interviewed by FBI special agents at the Joplin Resident Agency in Joplin, Missouri. Tr. at 135–36 (Purcell); *id.* at 329 (Yoder). FBI Special Agent Allen Purcell conducted the interview. *Id.* at 135 (Purcell). During the interview, Yoder admitted that he entered the Capitol on January 6, 2021. Tr. at 136 (Purcell); *id.* at 331 (Yoder). Yoder voluntarily gave FBI agents his cell phone and some of the colonial attire he wore on January 6, 2021. *Id.* at 145–51 (Purcell); *id.* at 330–31 (Yoder); GX 501 (Tri-Corn Hat); GX 502 (Overcoat); GX 503 (Cravat); GX 504 (Vest); GX 505 (Receipt of Property Form); GX 507 (Consent to Search Form); GX 511 (Compilation of Text Messages between Isaac Yoder and Kelly Yoder).

Yoder admitted that, around the same time as his voluntary interview with the FBI, he spoke with a reporter from the publication Newsweek. Tr. at 349–51 (Yoder). Yoder told the reporter that there "were people everywhere" in the Capitol. *Id.* at 350. He testified that he told the reporter that "[m]ost of us out there are on the side of the aisle who are the gun owners" and "[i]f we had collectively gone there to cause trouble, there would have been piles of bodies." *Id.* at 349. Yoder testified that he told the Newsweek reporter that he did not condone the damage that was done on January 6, and that if the intention was to cause trouble, that would make Trump supporters "the most pathetic group of people." *Id.* at 350–51 (Yoder). Yoder testified that he told the reporter from Newsweek that if Democrats were confident that President Joseph R. Biden won the 2020 Presidential Election fairly, they should have brought the issue before the Supreme Court to appease the naysayers. *Id.* at 351 (Yoder). Yoder told the reporter he was not concerned at that time about the potential for being criminally prosecuted for his actions on January 6, and said it was the "anarchy in government" that concerned him. *Id.*

## II.   CONCLUSIONS OF LAW

### A. Count One

Count One of the Second Superseding Information charges Yoder with entering or remaining in a restricted building or ground, in violation of 18 U.S.C. § 1752(a)(1). In order to find the defendant guilty of that offense, "the Court must find the following beyond a reasonable doubt: (1) the defendant entered or remained in a restricted building without lawful authority to do so; and (2) the defendant did so knowingly." *United States v. Rivera*, 607 F. Supp. 3d 1, 7 (D.D.C. 2022) (Kollar-Kotelly, J.).

As relevant here, "the term 'restricted building or grounds' means any posted, cordoned off, or otherwise restricted area . . . of a building or grounds where the President or other person protected by the Secret Service is or will be temporarily visiting." 18 U.S.C. § 1752(c)(1)(B). The term "person protected by the Secret Service" includes the Vice President and the immediate family of the Vice President. 18 U.S.C. §§ 1752(c)(2), 3056. A person acts "knowingly" if he realizes what he is doing and is aware of the nature of his conduct, and does not act through ignorance, mistake, or accident. *United States v. Alston-Graves*, 435 F.3d 331, 337 (D.C. Cir. 2006); *see also Arthur Andersen LLP v. United States*, 544 U.S. 696, 705 (2005). In deciding whether the defendant knowingly entered or remained in a restricted building, the Court may consider all evidence of the surrounding circumstances, including what the defendant did or said. *See* 1 Crim. Jury Instrs. for D.C. § 3.101 ("Proof of State of Mind"); William J. Bauer Pattern Crim. Jury Instrs. of the 7th Cir. § 4.10 ("Definition of Knowingly"); *see also* 3d Cir. Model Jury Instrs., Crim. § 5.02 ("Knowingly").

First, the government proved beyond a reasonable doubt that Yoder entered and remained in a restricted area on January 6, 2021, *i.e.,* the United States Capitol Building and grounds.

The testimony of Inspector Lanelle Hawa established that then-Vice President Pence and members of his family—who were USSS protectees—were scheduled to, and in fact did, travel to the

11

United States Capitol on January 6, 2021, in order for the Vice President to preside over the congressional certification of the 2020 Presidential Election. *See* Tr. 15, 20 (Hawa); GX 107. The testimony of Inspector Hawa and Captain Ronald Ortega further established that, in preparation for this event, the USSS and USCP adopted a restricted area around the U.S. Capitol Grounds that was closed to members of the public. *See* Tr. at 18–20 (Hawa); Tr. at 49–52 (Ortega); GX 104. Captain Ortega described how the perimeter of the restricted area on January 6, 2021 was delineated with bike racks and snow fencing with signage indicating that the area was closed. *See* Tr. at 51–54 (Ortega); GX 105, 106. There were additional layers of barricades within the restricted area, including at the entrance to the scaffolding on the west side of the Capitol, a construction zone for the inaugural stage. *See* Tr. at 44, 123–25 (Ortega). Further, the Capitol Building itself was closed to the public on January 6, 2021, as it had been for months prior. *See id.* at 48–50.

The testimony of FBI Special Agent Purcell, who recounted Yoder's interview statements that he passed barricades and climbed scaffolding, and the testimony of Yoder himself, who testified similarly, establish that Yoder entered the restricted area in the afternoon on January 6, 2021. *See id.* 140–41, 176 (Purcell); *id.* at 344–45, 353 (Yoder). Moreover, the same testimony and the video evidence introduced at trial, most notably the Capitol CCV footage, undisputedly establish that Yoder entered the U.S. Capitol building itself at 3:14 p.m. on January 6, 2021, and that he remained inside for just under 20 minutes. *See* GX 304; GX 305.

Second, the evidence established that Yoder knew that the Capitol grounds and Capitol Building were restricted and that he was not permitted on the Capitol grounds or in the Capitol Building itself.

Before Yoder even entered the grounds, Yoder's own brothers told him that police were deploying tear gas and rubber bullets against rioters and that rioters had broken into the Capitol. *See* Tr. at 139–40 (Purcell); *id.* at 308 (Yoder). Yoder saw and passed bike racks and/or barricades that

had been pushed aside by other rioters. *Id.* at 140–41 (Purcell); *id.* at 310 (Yoder). Yoder climbed scaffolding to reach the Upper West Terrace. *Id.* at 176 (Purcell); *id.* at 353 (Yoder). When Yoder arrived at the Senate Wing Door, he saw that it had been broken, that the windows next to the door had been broken out, and that rioters were entering the building through both the door and the windows. *Id.* at 313, 363–64 (Yoder); *see also id.* at 141 (Purcell). Yoder heard an alarm blaring, which Captain Ortega testified was triggered when the door had been opened, and realized at the time that it was connected to "the breach." *See id.* at 322–23, 362 (Yoder); *id.* at 71, 106, 128–30 (Ortega). Yoder testified that he smelled pepper spray or tear gas. *Id.* at 342 (Yoder). Once inside the building, he stood on what he described as a "pile of wood or what looks like maybe a table or something broken," in order to address other rioters. *Id.* at 316–17 (Yoder). Yoder was carrying a metal sword and a flag on a large flagpole, which were not permitted in the Capitol even if it were open to the public—and which Yoder did not bring into the secure perimeter for President Trump's rally earlier that day, even though he denied that was the reason. *See* Tr. at 81–83, 112 (Ortega); *id.* at 137–38 (Purcell); *id.* at 346–47 (Yoder). Any of these signs told Yoder that he was not permitted to enter the Capitol grounds, enter Capitol itself, or to subsequently remain there. *See* Tr. of Bench Trial (Day 3) at 401–02, ECF No. 81, *United States v. Brock*, No. 21-cr-140-JDB (D.D.C. Dec. 6, 2022) (relying on similar indicia of knowledge to find that defendant knowingly entered Capitol Building and grounds without lawful authority to do so).

Yoder's testimony that he was believed he was permitted to go inside the Capitol Building because officers did was not stop him and had "complete control" was also not credible. Tr. at 365. Yoder's explanation to the Court that he did not believe the officers were overwhelmed and did not see violence, in addition to being inconsistent with the evidence, conflicts with his own testimony about smelling pepper spray or tear gas and hearing about the chaos from his family members. *See id.* at 308, 342, 363–64 (Yoder).

Furthermore, Yoder even knew that Vice President Pence, a Secret Service protectee, was visiting the Capitol Building and grounds, as demonstrated by the fact that he went there in response to learning that "Pence folded." *Id.* at 308, 343 (Yoder); *id.* at 188–89 (Purcell).

The Court finds beyond a reasonable doubt that (1) Yoder entered or remained in a restricted building without lawful authority to do so and (2) he did so knowingly. The Court therefore finds Yoder **GUILTY** on Count One.

### B. Count Two

Count Two of the Second Superseding Information charges Yoder with disorderly or disruptive conduct in a restricted building or grounds, in violation of 18 U.S.C. § 1752(a)(2). In order to find the defendant guilty of that offense, "the Court must find the following beyond a reasonable doubt: (1) the defendant engaged in disorderly or disruptive conduct in, or in proximity to, any restricted building; (2) the defendant did so knowingly, and with the intent to impede or disrupt the orderly conduct of Government business or official functions; and (3) the defendant's conduct occurred when, or so that, his conduct in fact impeded or disrupted the orderly conduct of Government business or official functions." *Rivera*, 607 F. Supp. 3d at 8.

The terms "disorderly" and "disruptive" have their plain meanings. "'Disorderly' conduct is that which 'tends to disturb the public peace, offend public morals, or undermine public safety.' . . . Conduct is 'disruptive' if it 'tend[s] to disrupt some process, activity, condition, etc.'" *Id.* (quoting "Disorderly," Black's Law Dictionary (9th ed. 2009); "Disorderly," Oxford English Dictionary (2d ed. 1989); "Disruptive," Merriam-Webster.com Dictionary (June 16, 2022)); *see also United States v. Grider*, — F. Supp. 3d —, 2022 WL 17829149, at *12 (D.D.C. 2022) (same).

First, Yoder's conduct inside the Capitol Building and grounds was both disorderly and disruptive.

As another judge in this district has explained, "[e]ven mere presence in an unlawful mob or riot is both (1) 'disorderly' in the sense that it furthers the mob's 'disturb[ing] the public peace' and (2) 'disruptive' insofar as it disturbs the normal and peaceful condition of the Capitol grounds and buildings, its official proceedings, and the safety of its lawful occupants." *Rivera*, 607 F. Supp. 3d at 8 (alteration in original); *see also* Tr. of Bench Trial (Day 3) at 404, ECF No. 81, *Brock*, No. 21-cr-140-JDB; Tr. of Verdict in Bench Trial at 46–47, ECF No. 106, *United States v. Fitzsimons*, No. 21-cr-158-RC (D.D.C. Oct. 27, 2022) (both agreeing). In this case, the evidence established that the presence of rioters inside the Capitol Building, including non-violent rioters like Yoder, was disruptive and disorderly in that they prevented Congress from conducting the certification. *See, e.g.,* Tr. at 279 (Kelly). Those rioters had not been through security screening and thus posed a security risk through their mere presence. *See id.* at 27 (Hawa); *see also id.* at 276 (Kelly) ("I don't know how you would screen people coming through a window"). The breach of the Capitol by those rioters caused the evacuation of Vice President Pence, his family, and members of Congress. *See, e.g., id.* at 26, 70 (Hawa); *id.* at 279 (Kelly).

Yoder did more than simply go inside, however. As described above, Yoder made a speech to other rioters atop a pile of broken furniture, walked around the hallways and Crypt in colonial gear with a flag and sword, and allowed other rioters to take photos with him, all adding to the chaos and further impeding efforts of the police officers to clear the building. The government established that Yoder's conduct inside the Capitol and its grounds was both disorderly and disruptive.

Second, Yoder entered the Capitol knowingly and with the intent to impede or disrupt the orderly conduct of Government business or official functions.

The law permits the factfinder to infer that a person intends the natural and probable consequences of their actions. *See United States v. Mejia*, 597 F.3d 1329, 1341 (D.C. Cir. 2010). "[T]he probable and natural consequence of breaking into the United States Capitol is the disruption

of Congressional business and proceedings." *Rivera*, 607 F. Supp. 3d at 8; *see also* Tr. of Bench Trial (Day 3) at 397, ECF No. 81, *Brock*, 21- cr-140-JDB; Tr. of Verdict in Bench Trial at 47, ECF No. 106, *Fitzsimons*, No. 21-cr-158-RC. In this case, Yoder testified that he knew that the certification of the election was supposed to take place at the Capitol that day, and nonetheless decided to join the mob that had forced its way into the Capitol. Tr. at 305; *see also* Tr. of Bench Trial (Day 3) at 405-06, ECF No. 81, *Brock*, No. 21-cr-140-JDB (pointing to awareness of the certification, the mob, and clashes with law enforcement).

Moreover, there is ample evidence from Yoder's conduct and statements that he specifically intended to disrupt Congress and its business. Yoder posed with a sign near the Washington Monument espousing theories of election fraud, and he testified that he agreed with its sentiment. *See* GX 705; Tr. at 348. Yoder decided to go to the Capitol only *after* his brothers told him that "Pence folded" and that rioters had broken into the Capitol. Tr. at 139–40 (Purcell); *id.* at 308, 343–44 (Yoder).[1] Once inside, Yoder told other rioters, "We've been so weak. We've lost any type of credibility because all we ever do is cave. We don't riot. We don't do bad things. We keep the law." *See* GX 401; Tr. at 340–41 (Yoder). Yoder admitted that by "we," he meant "Trump supporters." Tr. at 340 (Yoder). In short, Yoder believed that supporters of President Trump, who he characterized as law-abiding, were weak and had "cave[d]" by allowing Congress to certify the 2020 Presidential Election. *Id.; see also id.* at 333 (Yoder interpreted "Pence folded" in a similar way). After the events of January 6, 2021, Yoder also told a reporter from Newsweek that "if Democrats were confident that Biden won fairly, they should have brought the issue before the

---

[1] Even if the Court were to credit Yoder's assertion that he believed the certification was complete, it would still find that Yoder had the intent to disrupt congressional business. Yoder clearly knew that rioters had forced their way into the Capitol; took extraordinary steps to join them, including climbing scaffolding; and at the very least intended to provide "brave support" to the rioters inside the building. Tr. at 188 (Purcell; *see* Tr. of Bench Trial (Day 3) at 397–98, ECF No. 81, *Brock*, No. 21-cr-140-JDB (explaining in the context of 18 U.S.C. § 1512(c)(2) that "it is reasonable to conclude that Mr. Brock was aware that his actions in entering the Capitol would have the probable effect of obstructing the election certification that day.").

Supreme Court to appease the naysayers," and that what concerned him was not a potential criminal prosecution for his actions on January 6, 2021, but rather "the anarchy in government." *Id.* at 351. Yoder's words and actions on January 6, 2021 and after make plain that his intent was to protest and disrupt Congressional proceedings around the certification of the 2020 Presidential Election.

Third, Yoder's presence in the Capitol in fact disrupted the certification.

"'Even the presence of one unauthorized person is reason to suspend the Congressional proceedings,' and disruption grows with the mob." *Grider*, 2022 WL 17829149, at *13 (quoting *Rivera*, 607 F. Supp. at 9). As the testimony of Inspector Hawa, Captain Ortega, and Lieutenant Kelly amply demonstrated, the certification stopped when the rioters breached the Capitol and could not resume until the building had been cleared hours later. *See* Tr. at 28–30 (Hawa); *id.* at 69–70, 98–99 (Ortega); *id.* at 251–52 (Kelly). Yoder's presence added to the problem of an overwhelmed police force attempting to hold back a flood of rioters, and ultimately, clear the building. *See id.* at 108–09 (Ortega); *see also id.* at 253 (Kelly describing the officers by the Senate Wing Door as "vastly outnumbered" when Yoder entered). By being part of the mob that stormed the Capitol on January 6, Yoder in fact disrupted the orderly conduct of Government business or official functions.

The Court finds beyond a reasonable doubt that Yoder knowingly, and with the intent to impede or disrupt the orderly conduct of Government business, engaged in disorderly and disruptive conduct in, or in proximity to, a restricted building that in fact impeded and disrupted the orderly conduct of Government business and official functions. The Court therefore finds the Yoder **GUILTY** on Count Two.

### C. Count Three

Count Three of the Second Superseding Information charges Yoder with violent entry and disorderly conduct[2] in a Capitol Building, in violation of 40 U.S.C. § 5104(e)(2)(D). In order to find

---

[2] Although the Second Superseding Information refers to the offense as "Violent Entry and Disorderly Conduct in a Capitol Building," Second Superseding Information at 2, "violent entry" is not an element of the offense and is not

the defendant guilty of that offense, "the Court must find the following beyond a reasonable doubt: (1) the defendant engaged in disorderly or disruptive conduct in any of the United States Capitol Buildings; (2) the defendant did so with the intent to impede, disrupt, or disturb the orderly conduct of a session of Congress or either House of Congress; and (3) the defendant acted willfully and knowingly." *Rivera*, 607 F. Supp. 3d at 10.

The first two elements of the offense are easily met. The term "United States Capitol Buildings" includes the United States Capitol located at First Street, Southeast, in Washington, D.C., which Yoder undisputedly entered. *See* 40 U.S.C. § 5101. For the same reasons explained above with respect to Count Two, Yoder's conduct inside the Capitol was both disruptive and disorderly; and Yoder acted with the intent to impede, disrupt, or disturb the orderly conduct of a session of Congress or either House of Congress.

Yoder also acted willfully and knowingly.

A person acts "willfully" if he acts with the intent to do something that the law forbids, that is, to disobey or disregard the law. *See United States v. Burden*, 934 F.3d 675, 680 (D.C. Cir. 2019). "Willfully" does not, however, require proof that the defendant be aware of the specific law or rule that his conduct may be violating. *See United States v. Bryan*, 524 U.S. 184, 190–96 (1998). As explained above, a person acts "knowingly" if he realizes what he is doing and is aware of the nature of his conduct, and does not act through ignorance, mistake, or accident. *See Alston-Graves*, 435 F.3d at 337.

The testimony and other evidence presented at trial showed that Yoder believed the 2020 Presidential Election was "stolen," and went to the Capitol after having heard that Pence folded and

---

expressly referenced in the text of the statute, which prohibits willfully and knowingly "utter[ing] loud, threatening, or abusive language, or engag[ing] in disorderly or disruptive conduct, at any place in the Grounds or in any of the Capitol Buildings with the intent to impede, disrupt, or disturb the orderly conduct of a session of Congress or either House of Congress, or the orderly conduct in that building of a hearing before, or any deliberations of, a committee of Congress or either House of Congress," 40 U.S.C. § 5104(e)(2)(D).

that rioters had "forced" their way in. *See, e.g.*, GX 705.  The overwhelming evidence, described above in connection with Count One, shows that Yoder knew that his presence around and in the Capitol was unauthorized.  Nevertheless, almost immediately after entering, Yoder shouted about the "cave[d]" certification. *See* GX 401. Accordingly, the Court concludes that Yoder acted willfully as well—that he knew what he was doing was against the law. *See, e.g., Rivera*, 607 F. Supp. 3d at 10; *see also* Tr. of Verdict in Bench Trial at 52, ECF No. 106, *Fitzsimons*, No. 21-cr-158-RC ("Mr. Fitzsimons' recasting of a narrative afterwards also provides further circumstantial evidence that he was, in fact, aware that he had broken the law.").

The Court finds beyond a reasonable doubt that Yoder willfully and knowingly engaged in disorderly and disruptive conduct in the United States Capitol Building with the intent to impede, disrupt, or disturb the orderly conduct of a session of Congress. The Court therefore finds Yoder **GUILTY** on Count Three.

### D. Count Four

Count Four of the Second Superseding Information charges Yoder with parading, demonstrating, or picketing in a Capitol Building, in violation of 40 U.S.C. § 5104(e)(2)(G).  In order to find the defendant guilty of that offense, "the Court must find the following beyond a reasonable doubt: (1) the defendant paraded, demonstrated, or picketed in any of the United States Capitol Buildings; and (2) the defendant acted willfully and knowingly." *Rivera*, 607 F. Supp. 3d at 10.

"To 'parade' means to take part in '[a] march or procession, organized on a grand scale, in support of some political object.'" *Rivera*, 607 F. Supp. 3d at 10 (alteration in original) (quoting Oxford English Dictionary (2d ed. 1989)). The term "demonstrate" refers to group conduct that would disrupt the orderly business of Congress by, for example, impeding or obstructing passageways, hearings, or meetings, but does not include activities such as quiet praying. *Bynum v. United States Capitol Police Board*, 93 F. Supp. 2d 50, 58 (D.D.C. 2000); *see also Rivera*, 607 F. Supp. 3d at 10

(providing one definition for "demonstrating" as taking place in "[a] public manifestation, by a number of persons, of interest in some public question, or sympathy with some political or other cause; usually taking the form of a procession and mass-meeting" (alteration in original) (quoting Oxford English Dictionary (2d ed. 1989)). "Taking these words in light of their neighbors, . . . the Court understands Section 5104(e)(2)(G) . . . to 'prohibit[] taking part in an organized demonstration or parade that advocates a particular viewpoint.'" *United States v. Munchel*, No. 21-cr-118-RCL, 2023 WL 2992689, at *7 (D.D.C. Apr. 18, 2023) (quoting *United States v. Nassif*, — F. Supp. 3d —, 2022 WL 4130841, at *6 (D.D.C. 2022) (Bates, J.)).

First, Yoder paraded and demonstrated in the Capitol Building.

Yoder testified that he intended to send a message by wearing his colonial costume—a nod to America's founding. Tr. at 338 (Yoder). Once inside the Capitol, he drew attention to himself by shouting to other rioters about how Trump supporters had "cave[d]" on the certification, an overtly political message. *See* GX 401. Yoder also knew that he was a highly visible member of the mob. *See* Tr. at 303, 310 (Yoder). The CCV footage shows that Yoder marched around the Crypt, in full colonial attire, stopping repeatedly to pose for photos. *See* GX 203; GX 204; GX 406–11. Moreover, Yoder conveyed his message not acting alone, but as a part of "an organized demonstration or parade that advocates a particular viewpoint." *Nassif*, 2022 WL 4130841, at *6. Although Yoder appeared to express some concern with the crowd "riot[ing]" and "do[ing] bad things," GX 401, he voluntarily joined the crowd and expressed a shared message—that the 2020 Presidential Election was "stolen"—alongside the others. Also as a part of his speech, Yoder lamented that "*we* . . . cave[d]." *Id.* (emphasis added). Videos and photographs show Yoder joining the crowd as it circulates through areas of the Capitol, stopping to speak and/or take photographs with other participants. GX 201; GX 203; GX 204; GX 411. And Yoder testified that he told Newsweek after the riot that "[i]f *we* had collectively gone there to cause trouble, there would have been piles of bodies," further indicating

that he understood himself to be part of a "collective[]" demonstration. Tr. at 349–50 (emphasis added).

The evidence thus shows that Yoder took part in a procession in support of a political object, and that his conduct also disrupted the orderly business of Congress, as well as being a highly public manifestation of his political support. *See Rivera*, 607 F. Supp. 3d at 10–11; Tr. of Bench Trial (Day 3) at 413, ECF No. 81, *Brock*, No. 21-cr-140-JDB (concluding that the January 6 riot was a "demonstration in any common understanding of that term"). Therefore, the Court finds that Yoder both paraded and demonstrated.

For the same reasons explained with respect to Counts One and Three, Yoder knew he was not supposed to be inside the Capitol building, and therefore he also acted willfully and knowingly.

The Court finds beyond a reasonable doubt that Yoder willfully and knowingly paraded and demonstrated in the Capitol Building. Accordingly, the Court finds Yoder **GUILTY** on Count Four.

## III.   CONCLUSION

For the foregoing reasons, the Court finds beyond a reasonable doubt that Isaac Samuel Yoder engaged in conduct constituting all four of the charged offenses. The Court therefore **ADJUDGES** the defendant **GUILTY** on Counts One, Two, Three, and Four. A separate Order shall issue setting a sentencing date, which shall occur approximately 90 days following the entry of these Findings of Fact and Conclusions of Law.

Date: May 26, 2023

Royce C. Lamberth
United States District Judge