## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | **Case No. 21-cr-505 (RCL)** |
| **v.** | : | |
| | : | |
| **ISAAC YODER,** | : | |
| | : | |
| **Defendant** | : | |

### GOVERNMENT'S SENTENCING MEMORANDUM

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Defendant Isaac Yoder to 13 months' incarceration, 36 months' probation, 60 hours of community service, $500 in restitution, and a fine of $16,646, or the equivalent of the amount raised for Isaac Yoder relating to his criminal conduct at the time of sentencing. The 13-month recommendation is at the middle of the advisory Guidelines imprisonment range of 10 to 16 months, which the government submits is the correct Guidelines calculation.

### I.      Introduction

Defendant Isaac Yoder, a 34-year-old locksmith, participated in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of Congress's certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than 2.9 million dollars in losses.[1]

---

[1] As of July 7, 2023, the approximate losses suffered as a result of the siege at the United States Capitol was $2,923,080.05. That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police. The Metropolitan Police Department (MPD) also suffered losses as a result of January 6, 2021, and is

Yoder comes before the Court having been found guilty after a bench trial, this Court found Yoder guilty of: (1) Entering and Remaining in a Restricted Building or Grounds, in violation of 18 U.S.C. § 1752(a)(1); (2) Disorderly and Disruptive Conduct in a Restricted Building or Grounds, in violation of 18 U.S.C. §1752(a)(2); (3) Violent Entry and Disorderly Conduct in a Capitol Building, in violation of 40 U.S.C. §5104(e)(2)(D); and (4) Parading, Demonstrating, or Picketing in a Capitol Building, in violation of 40 U.S.C. §5104(e)(2)(G).

As explained herein, a sentence of 13 months incarceration is appropriate in this case because (1) Yoder went to the Capitol in response to learning that, "Pence folded," and knowing that rubber bullets and pepper spray had been disbursed in altercations between police and rioters; (2) despite being a locksmith who acknowledges his experience with evictions, Yoder climbed scaffolding and entered the Senate Wing Door amidst broken glass, a broken door, and a blaring alarm; (3) Yoder entered the Capitol with a sword hanging on a scabbard at his belt and carried a flag on a pole; (4) after entering, Yoder climbed on broken furniture and yelled in an attempt to rouse other rioters; (5) Yoder added to the spectacle, and resulting disruption, by posing for pictures in a colonial-style costume with other rioters throughout the day; (6) Yoder's public statements months after January 6 and after the Court's finding of guilt demonstrate his intent to obstruct the certification of the election and his complete lack of remorse for his crimes; and (7) Yoder, under oath at his trial before this Court, demonstrated a lack of candor and honesty to deflect responsibility for his actions and cast himself and other rioters as welcome guests at the Capitol.

---

also a victim. MPD recently submitted a total of approximately $629,056 in restitution amounts, but the government has not yet included this number in our overall restitution summary ($2.9 million) as reflected in this memorandum. However, in consultation with individual MPD victim officers, the government has sought restitution based on a case-by-case evaluation.

The Court must also consider that Yoder's conduct on January 6, like the conduct of hundreds of other rioters, took place in the context of a large and violent riot that relied on numbers to overwhelm police officers who were trying to prevent a breach of the Capitol Building, and disrupt the proceedings. Here, the facts and circumstances of Yoder's crime support a sentence of 13 months incarceration.

## II.      Factual and Procedural Background

### The January 6, 2021 Attack on the Capitol

To avoid unnecessary exposition, the government refers to the general summary of the attack on the U.S. Capitol. *See* Findings of Fact and Conclusions of Law, ECF No. 65, at 2-5.

### Defendant Yoder's Role in the January 6, 2021 Attack on the Capitol

As this Court found, "[t]he testimony and other evidence presented at trial showed that Yoder believed the 2020 Presidential election was 'stolen,' and he went to the Capitol after having heard that 'Pence folded' and that rioters had 'forced' their way in." *Id.* at 18-19. Yoder watched speeches at the "Stop the Steal" rally from an area near the Washington Monument—outside of the magnetometers set up for security at the rally. He posed for a photograph with a sign stating, "SUBTRACT UNVERIFIED VOTES DEAD PEOPLE ILLEGAL VOTES CHINA'S 4 MIL BALLOTS TRUMP WINS." *Id.* at 6. After the speeches, Yoder walked back to where the family vehicle was parked and found his family members "distressed and upset." At that point, his brothers told him that, "[i]t's bad," "Pence folded," and that people had broken into the Capitol. *Id.* One of his brothers said that he had been hit by rubber bullets, another brother had been pepper sprayed, and his niece and nephew were suffering from the effects of pepper spray. *Id.*

3

In response, Yoder left his family and headed toward the Capitol against the flow of the crowd, which was leaving the area.  *Id.*  "Yoder went around the barricades and climbed scaffolding to make his way onto the West Front of the Capitol."  *Id.*

Yoder then entered the Capitol through the Senate Wing Door at approximately 3:14 p.m. *Id.*  "Yoder was dressed in the colonial attire in the style of George Washington."  *Id.* at 5.  He carried a flagpole with an American flag and had a sword, made of metal and with a point, "hanging in a scabbard at his belt."  *Id.* at 6.  "As he entered the Senate Wing Door, Yoder saw broken glass and a broken door," as well as people entering and exiting through windows.  *Id.* at 7-8.  Yoder "smelled pepper spray or tear gas" and "heard a loud beeping noise."  *Id.* at 8.

"Shortly after entering the building, Yoder climbed atop a pile of broken wooden furniture,[2] swung his flag around, and yelled over the crowd noise, 'We've been so weak.  We've lost any kind of credibility because all we ever do is cave.  We don't riot.  We don't do bad things. We keep the law.'"  *Id.* at 9.  Other rioters destroyed furniture, art, and damaged other parts of the Capitol building, and Yoder capitalized on the destruction by climbing on a pile of destroyed furniture and yelling to gain the attention of those around him.

---

[2] The pile of broken furniture was vandalized by other rioters.  *See* "This is the damage rioters caused to the Capitol building," CNN, available at www.cnn.com/2021/01/07/us/rioters-capitol-building-damage-photos-trnd/index.html (last accessed Aug. 6, 2023).



*Figure 1: Screenshot from Trial Ex. 401 showing Yoder on top of destroyed property*

Yoder recklessly waved the flagpole and narrowly missed hitting people with it.



*Figure 2: Screenshot of Yoder with the flagpole from Trial Ex. 304*

Yoder then got down off of the broken furniture, posed for pictures, and walked to the

Crypt. *Id.* at 9. As the Court previously found, "[a]fter circulating around the Crypt for some

time, Yoder encountered a USCP officer who expressly asked him to leave, a request with which

Yoder complied." *Id.* at 9.



***Figure 3: Screenshot of Yoder with Police Officer from Trial Ex 409***

Yoder left the Capitol at 3:33 p.m. through the same Senate Wing Door he had entered. *Id.*

*Yoder's FBI and Newsweek Interviews*

In March of 2021, Yoder voluntarily met with FBI agents, and also with a reporter from

Newsweek. *Id.* at 10. In the interview with FBI agents, he acknowledged entering the Capitol on

January 6, 2021. *Id.* Among other things, he also stated that he viewed the rally at a separate

location from his family because of the items he was carrying. Tr. at 137-138 (Purcell).

Showing no remorse for his actions, Yoder ruminated in the Newsweek interview on how

many people would have died if he and other rioters had used firearms at the riot, saying, "[m]ost

of us out there are on the side of the aisle who were the gun owners," and "[i]f we had collectively

gone there to cause trouble, there would have been piles of bodies. We could have leveled things."

*Id.* He did not consider being criminally prosecuted for his own actions, but instead criticized the

"anarchy in government.". *Id.*

*Yoder's Trial Testimony*

Yoder gave false and misleading testimony under oath at trial, as described in the PSR and the Court's Findings of Fact and Conclusions of Law. First, Yoder falsely claimed, in response to questioning from the Court, that "the actions of law enforcement made [him] feel comfortable," and that he was permitted to enter through the Senate Wing Door.  Tr. at 363. Yoder expanded on the lie on redirect, claiming that he believed he was permitted to walk into the Capitol building because of "[t]he presence of law enforcement" in the Senate Wing Door area where he entered.  With full knowledge of the conflicts between the police and rioters, he stood on a pile of broken furniture, amidst broken windows, then shamelessly testified at trial that police "seemed to have complete control."  Tr. at 365; *see also* ECF No. 65 at 8.  However, CCTV video footage (Trial Exhibit 201), testimony from two United States Capitol Police officers, Captain Ortega and Lieutenant Kelly, and Yoder's own admissions, demonstrated the speciousness of that claim.  As the Court stated in its Findings of Fact and Conclusions of Law, "the evidence presented at trial demonstrated that the [police] officers in the Capitol at that time had not simply decided to allow the crowd to run amok through the building—they were outnumbered, overwhelmed, and not in a position to prevent people from entering the building at the time Yoder entered."  ECF No. 65 at 8.  In addition, the Court concluded, that Yoder saw the barricades, saw other rioters climbing through broken windows, heard a blaring siren, and smelled pepper spray or tear gas.  *Id.* at 8–9.

Yoder also attempted to downplay and minimize what he had seen and heard when questioned at trial.  For example, Yoder admitted that he heard the Senate Wing Door alarm and that he knew that it, "probably had something to do with what was going on . . . . [with] the breach," but claimed that it did not deter him because it was "sort of a beeping" and "it wasn't

very significant." Tr. At 362.  In truth, the alarm was blaring when Yoder entered. Trial Ex. 401.

Similarly, Yoder downplayed his knowledge of the security procedures in place at the "Stop the

Steal" rally.  Yoder admitted that he was aware that there was security at the rally but claimed

that he had not seen any magnetometers. Tr. At 345–47.  Nonetheless, he claimed that the

possession of two items capable of being used as weapons—a metal sword and a flagpole—were

not the reason that he did not and could not go with his family to the area where the speeches

were.  Tr. At 345–46.  This obvious lie was flatly contradicted by his earlier statements to the

FBI.  Tr. At 137–38.

Similarly, he claimed that he climbed on broken furniture and yelled to the other rioters

as a way to calm the other rioters down.  He claimed that when he yelled "we don't do this sort

of thing," he meant that Trump supporters don't breach buildings, break glass, or otherwise

cause harm.  Tr. 343 ("I mean, goodness, breaking and entering.  No, we don't.").  Yoder's lie

was obvious in the context of the rest of his exclamations on January 6, 2021: "We've been so

weak.  We've lost any kind of credibility because all we ever do is cave.  We don't riot.  We

don't do bad things.  We keep the law."  The lie was also contradicted by his actions in

breaching the Capitol, and the actions of others all around him.  The Court rejected his claim that

the yelling was a way to express displeasure with the crowd.  ECF No. 65 at 9 ("[T]o the extent

that Yoder's testimony suggests he did not understand himself to be joining the crowd within the

Capitol to protest the election results, the Court does not credit that testimony.").

*Yoder's Post-Trial Interview*

As stated in the PSR, Yoder was interviewed on video in July 2023 regarding his

experience as a defendant and the footage was posted online, where it remains. PSR ¶ 90; Justice

in Jeopardy (Sov Souls), *J6 | DAY 918 |Truth and Light Fest 2023 | Isaac Yoder | David Clements*

| *Zac Martin* (available at https://rumble.com/v3024du-j6-day-918-truth-and-light-fest-2023-isaac-yoder-david-clements-zac-martin.html).  The video was apparently taken during the second day of the "Truth and Light Freedom Festival."[3]  *See* Sentencing Exhibit A (Yoder interview beginning at approximately 41 minutes into the video).

During the post-trial interview, Yoder accepted no responsibility for his criminal conduct and instead blamed the government for the events of January 6.  He stated that, he "didn't think that the government was actually going to pull something so big and bad . . . they literally set up the American people."  *Id.* at approx. 48:05-49:10. And that, "People need to understand what the government did that day was so, so repugnant to everything that the Constitution, our founding." He blamed others, stating, "they should have been honored that a million plus people showed up" and instead "they threw the American people under the bus," "they really have no excuse for doing what they did," and "[t]hey literally showed the upmost contempt for the people."  *Id.* at approx. 48:55-50:13.

In the Truth and Light Festival interview, Yoder acknowledged that he was the only member of his family who entered the Capitol and admitted that he did not have concerns about Antifa.  But in the same interview, he claimed that when he walked into the Capitol he thought, "yeah, we've been set up" and repeated what he had said in his incredible trial testimony that the Capitol riot was a "controlled situation."  *Id.* at approx. 51:00-19.

---

[3] Described by the organizers as "[a]n amazing weekend of love and support for our J6 community" featuring fireworks and speakers, including "some of the J6 Detainees," and advertising that "[a]ny J6 Defendant previously or currently under indictment is absolutely free[.]"  American Patriot Relief, *J6 Truth and Light Freedom Festival!!!* (available at https://www.zeffy.com/en-US/ticketing/eaa5b48f-3674-4a05-9472-24b7f0ed5da3) (last visited August 17, 2023).

Yoder claimed that he felt violated because Pretrial Services gathering information was the government "reaching in with malicious intent." *Id.* at approx. 54:45-55:15. He contrasted his proceedings with televised legal proceedings for celebrities, and falsely claimed that the government did not want proceedings televised because "they are so fraught with corruption." *Id.* at approx. 1:07:15-55. He claimed it should be "illegal" for his sentencing not to be public,[4] and he appeared to agree with the interviewer's characterization that the Court was a "kangaroo court." *Id.* at approx. 1:07:50-108:48. Finally, he acknowledged fundraising through GiveSendGo. *Id.* at 1:09:00-25.

*The Charges and Trial*

On July 29, 2021, the United States charged Yoder by criminal complaint with violating 18 U.S.C. §§ 1752(a)(1) and (2) and 40 U.S.C. §§ 5104(e)(D) and (G). On August 4, 2021, Yoder was arrested in Springfield, Missouri. On August 4, 2021, the United States charged Yoder by a four-count Information with violating 18 U.S.C. §§ 1752(a)(1) and (2) and 40 U.S.C. §§ 5104(e)(D) and (G). The Information was superseded on February 25, 2022, and superseded a second time on March 11, 2022. Yoder appeared before this Court for a bench trial on March 20 and 21, 2023. Yoder asserted his Constitutional rights to testify and present evidence. On May 26, 2023, this Court issued its Findings of Fact and Conclusions of Law (ECF 65), finding Yoder guilty on all counts.

## III. Statutory Penalties

Yoder now faces sentencing on all four counts. Yoder faces up to one year of imprisonment and a fine of up to $100,000 on each of the first two counts in the Second Superseding Information: 18 U.S.C. §§ 1752(a)(1) and (2). Yoder also faces an additional six months of imprisonment and

---

[4] Yoder's sentencing is being held virtually at Yoder's own request.

10

fine of up to $5,000 on each of the remaining two counts of the Information:  40 U.S.C. §§ 5104(e)(D) and (G).  Yoder may also be ordered to pay restitution.

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49 (2007). "As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark" for determining a defendant's sentence. *Id.* at 49. The United States Sentencing Guidelines ("U.S.S.G." or "Guidelines") are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions" and are the "starting point and the initial benchmark" for sentencing. *Id.* at 49.

The government agrees with the Sentencing Guidelines offense level calculation set forth in the PSR. According to the PSR, the U.S. Probation Office calculated Yoder's total adjusted offense level under the Sentencing Guidelines as follows:

Base Offense Level (U.S.S.G. §2A2.4)[5]                                        10

---

[5] The Probation Office determined that Counts One and Two should be grouped before calculating the overall offense level based on Count Two.  The government calculates the guidelines for each offense as follows:  First, for Count One:

| | |
|---|---|
| Base Offense Level (U.S.S.G. §2B2.3(a)) | 4 |
| Trespass "at any restricted buildings or grounds" (U.S.S.G. §2B2.3(b)(1)(A)(vii)) | +2 |
| Obstructing the Administration of Justice (U.S.S.G. §3C1.1(a)) | +2 |
| Dangerous weapon (U.S.S.G. §2B2.3(b)(2). | +2 |
| Total Adjusted Offense Level | +12 |

The points for a dangerous weapon should be included because Yoder carried a metal sword with a point, which is either "capable of inflicting death or serious bodily injury" or "closely resembles such an instrument."  U.S.S.G. §1B1.1 app. n.1(E).  In addition, the defendant also carried an American flag on a pole, which is an instrument "capable of inflicting . . . serious bodily injury."  *See generally* ECF No. 65 at 2-3, 6 (findings regarding the restricted area, flag, and sword).
For Count Two:

| | |
|---|---|
| Base Offense Level (U.S.S.G. §2A2.4) | 10 |
| Obstructing the Administration of Justice (U.S.S.G. §3C1.1(a)) | +2 |
| Total Adjusted Offense Level | +12 |

       Obstructing the Administration of Justice (U.S.S.G. §3C1.1(a))    +2
       Total Adjusted Offense Level                                +12

*See* PSR at ¶¶ 52-60.

The U.S. Probation Office calculated Yoder's criminal history as a category I. PSR at ¶ 63. Accordingly, the U.S. Probation Office calculated Yoder's total adjusted offense level at 12, and his corresponding Guidelines imprisonment range at 10 to 16 months. *Id.* at ¶¶ 52-60, 63, 105.

The government disagrees with paragraphs 107, 108 of the PSR. *Id.* at ¶¶ 107, 108. As recognized in paragraph 108a, where the defendant has been convicted of multiple counts and Sentencing Guidelines range is higher than the statutory maximum for any one count—as here— the Court may (and should) impose consecutive or partially consecutive sentences on more than one count to get a total sentence of confinement within the Sentencing Guideline range. *See* U.S.S.G. §5G1.2(d).  Contrary to the Probation's response, the application note's reference to a statutory maximum restricting the guidelines in a multiple count case refers to the uncontroversial proposition that the sentence imposed *on each count* cannot exceed the statutory maximum.  See §5G1.2 n.3(B) ("[Where a statutorily authorized maximum sentence on a particular count is less than the minimum of the applicable guideline range, the sentence imposed on that count shall not be greater than the statutorily authorized maximum sentence *on that count*." (emphasis added)).  It does not supplant the operation of §5G1.2(d) authorizing the Court to run such sentences consecutively in a multiple-count case (up to the statutory maximum on each count) to equal the total Guidelines Range.

Here, while the Court must consider the § 3553 factors to fashion a just and appropriate sentence, the Guidelines unquestionably provide the most helpful benchmark. As this Court knows, the government has charged a considerable number of persons with crimes based on the January 6 riot. This includes hundreds of felonies and misdemeanors that will be subjected to

Guidelines analysis. In order to reflect Congress's will—the same Congress that served as a backdrop to this criminal incursion—the Guidelines are a powerful driver of consistency and fairness.

**IV.    Sentencing Factors Under 18 U.S.C. § 3553(a)**

In this misdemeanor case, sentencing is guided by 18 U.S.C. § 3553(a), which identifies the factors a court must consider in formulating the sentence. In this case, as described below, the Section 3553(a) factors weigh in favor of a term of incarceration within the properly calculated Sentencing Guidelines range.

**A.   The Nature and Circumstances of the Offense**

The attack on the U.S. Capitol on January 6 posed "a grave danger to our democracy." *United States v. Munchel*, 991 F.3d 1273, 1284 (D.C. Cir. 2021). The attack "endangered hundreds of federal officials in the Capitol complex," including lawmakers who "cowered under chairs while staffers blockaded themselves in offices, fearing physical attacks from the rioters." *United States v. Judd*, 21-cr-40, 2021 WL 6134590, at *5 (D.D.C. Dec. 28, 2021). While assessing Yoder's participation in that attack to fashion a just sentence, this Court should consider various aggravating and mitigating factors. Notably, for a misdemeanor defendant like Yoder, the absence of violent or destructive acts is not a mitigating factor. Had Yoder engaged in such conduct, he would have faced additional criminal charges.

Yoder was at his family car waiting for his relatives when he learned of the mayhem. Instead of choosing to leave the area, he immediately headed toward the Capitol, armed with a sword and a long flagpole.  He entered the Capitol after climbing on scaffolding, and entered through the Senate Wing Door, a non-public, alarmed emergency exit.   Yoder saw broken glass, a broken door, and people entering and exiting the Capitol through a broken window.  Under all

of these circumstances, Yoder—a professional locksmith—knew that he was not permitted to be in the Capitol building, yet he entered it anyway.

One of the most important factors in Yoder's case is the fact that right after he entered the Capitol, he climbed on a pile of wreckage from the rioters, recklessly swung his flagpole, and yelled to encourage other rioters from a higher vantage point and wearing a colonial costume to garner even more attention.  He continued to encourage rioters by posing for pictures.  Yoder traveled to the Crypt, and he only left the Capitol after a police officer asked him to leave.  In total, Yoder remained inside the Capitol for approximately 20 minutes.

Accordingly, the nature and the circumstances of this offense establish the clear need for a sentence of incarceration in this matter.

### B.  The History and Characteristics of Yoder

As set forth in the PSR, prior to his conduct on January 6, 2021, Yoder appears to have led a productive, law-abiding life. PSR ¶¶ 69-89.  Yoder is self-employed as a locksmith. PSR ¶ 88.  He has no criminal history other than traffic infractions.  PSR ¶¶ 61-68. Yoder has been compliant with his conditions of pre-trial release.

### C.  The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

The attack on the U.S. Capitol building and grounds was an attack on the rule of law. As with the nature and circumstances of the offense, this factor supports a sentence of incarceration, as it will in most cases, including misdemeanor cases, arising out of the January 6 riot. *See United States v. Joshua Bustle and Jessica Bustle*, 21-cr-238-TFH, Tr. 08/24/21 at 3 ("As to probation, I don't think anyone should start off in these cases with any presumption of probation. I think the

14

presumption should be that these offenses were an attack on our democracy and that jail time is usually -- should be expected") (statement of Judge Hogan).

### D.  The Need for the Sentence to Afford Adequate Deterrence

Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by this defendant. 18 U.S.C. § 3553(a)(2)(B-C), *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010).

*General Deterrence*

The need for general deterrence weighs heavily in favor of incarceration in nearly every case arising out of the violent riot at the Capitol. Indeed, general deterrence may be the most compelling reason to impose a sentence of incarceration. "Future would-be rioters must be deterred." (statement of Judge Nichols at sentencing, *United States v. Thomas Gallagher*, 1:21-CR-00041 Tr. 10/13/2021 at 37).

General deterrence is an important consideration because many of the rioters intended that their attack on the Capitol would disrupt, if not prevent, one of the most important democratic processes we have: the peaceful transfer of power to a newly elected President.

The gravity of these offenses demands deterrence. *See United States v. Mariposa Castro*, 1:21-cr-00299 (RBW), Tr. 2/23/2022 at 41-42 ("But the concern I have is what message did you send to others? Because unfortunately there are a lot of people out here who have the same mindset that existed on January 6th that caused those events to occur. And if people start to get the impression that you can do what happened on January 6th, you can associate yourself with that behavior and that there's no real consequence, then people will say why not do it again."). This was not a protest. *See United States v. Paul Hodgkins*, 21-cr-188-RDM, Tr. at 46 ("I don't think

that any plausible argument can be made defending what happened in the Capitol on January 6th as the exercise of First Amendment rights.") (statement of Judge Moss). And it is important to convey to future potential rioters—especially those who intend to improperly influence the democratic process—that their actions will have consequences. There is possibly no greater factor that this Court must consider.

*Specific Deterrence*

Yoder has accepted no responsibility for his crimes and has shown no remorse for his actions. He remains animated by his belief that the election—and the events of January 6 itself— was fraudulent. Approximately two months after January 6, he told a reporter from Newsweek that he was concerned about "the anarchy in government," rather than the how his own criminal activity contributed to the riot. Yoder exercised his right to testify at trial, and he chose to falsify and minimize aspects of his testimony in an attempt to escape accountability. He has also demonstrated—and continues to demonstrate—a profound lack of understanding of the significant impact his crimes, along with those of his fellow rioters, have caused to this nation. In July 2023, he claimed in an interview that he had been "set up," that Pretrial Services acted with "malicious intent," and that the court proceedings were "fraught with corruption."

### E.  The Need to Avoid Unwarranted Sentencing Disparities

As the Court is aware, the government has charged hundreds of individuals for their roles in this one-of-a-kind assault on the Capitol, ranging from unlawful entry misdemeanors, such as in this case, to assault on police officers, to conspiracy to corruptly interfere with Congress.[6] This

---

[6] A routinely updated table providing additional information about the sentences imposed on other Capitol breach defendants is available here: https://www.justice.gov/usao-dc/capitol-breach-cases. To reveal that table, click on the link "SEE SENTENCES HANDED DOWN IN CAPITOL BREACH CASES." The table shows that imposition of the government's recommended sentence in this case would not result in an unwarranted sentencing disparity.

Court must sentence Yoder based on his own conduct and relevant characteristics, but should give substantial weight to the context of his unlawful conduct: his participation in the January 6 riot.

Section 3553(a)(6) of Title 18 directs a sentencing court to "consider … the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct[.]"  So long as the sentencing court "correctly calculate[s] and carefully review[s] the Guidelines range, [it] necessarily [gives] significant weight and consideration to the need to avoid unwarranted disparities" because "avoidance of unwarranted disparities was clearly considered by the Sentencing Commission when setting the Guidelines ranges." *Gall v. United States*, 552 U.S. 38, 54 (2007). In short, "the Sentencing Guidelines are themselves an anti-disparity formula." *United States v. Blagojevich*, 854 F.3d 918, 921 (7th Cir. 2017). Consequently, a sentence within the Guidelines range will ordinarily not result in an unwarranted disparity.

Moreover, Section 3553(a)(6) does not limit the sentencing court's broad discretion "to impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing. 18 U.S.C. § 3553(a). After all, the goal of minimizing unwarranted sentencing disparities in Section 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The "open-ended" nature of the Section 3553(a) factors means that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "As the qualifier 'unwarranted' reflects, this provision leaves plenty of room for differences in sentences when warranted under the circumstances." *United States v. Brown*, 732 F.3d 781, 788 (7th Cir. 2013).

In cases for which the Sentencing Guidelines apply, "[t]he best way to curtail 'unwarranted' disparities is to follow the Guidelines, which are designed to treat similar offenses and offenders similarly." *United States v. Bartlett*, 567 F.3d 901, 908 (7th Cir. 2009). *See id.* ("A sentence within a Guideline range 'necessarily' complies with § 3553(a)(6)."). If anything, the Guidelines ranges in Capitol siege cases are more likely to understate than overstate the severity of the offense conduct. *See United States v. Knutson*, D.D.C. 22-cr-31 (FYP), Aug. 26, 2022 Sent. Hrg. Tr. at 24-25 ("If anything, the guideline range underrepresents the seriousness of [the defendant's] conduct because it does not consider the context of the mob violence that took place on January 6th of 2021.") (statement of Judge Pan).

Although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences explain the differing recommendations and sentences. While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the sentences in the following cases provide suitable comparisons to the relevant sentencing considerations in this case.

The instant case is most similar to *United States v. Russel Alford*, No. 1:21-cr-00263-TSC. Alford was also found guilty of all four misdemeanors, and he was sentenced to 12 months incarceration, within the Sentencing Guidelines range in his case. Although Alford is distinguishable because he refused to leave after ordered by police, in many respects the cases are similar. Both Yoder and Alford entered the Capitol despite multiple indicators that the building was restricted and through an entry the defendants knew had been broken by rioters. Alford mocked police in social media, and Yoder in his post-trial interview baselessly alleged that these court proceedings are "so fraught with corruption," appeared to agree with a comment that it was a "kangaroo court," and even claimed that Pretrial Services acted with "malicious intent." *See*

Sentencing Exhibit A at 55 minutes (discussing Pretrial) and 1 hour and seven minutes (discussing Court and trial).  Moreover, Yoder's conduct is more egregious than Alford because Yoder entered the Capitol with a sword and flagpole, which posed potential dangers to police and other rioters.

In *United States v. Rivera*, No. 1:21-cr-00060-CKK, the defendant was also convicted of the same four charges of which the defendant stands convicted.  Like Yoder, Rivera was inside the Capitol for approximately 20 minutes and encouraged other rioters.  The Court sentenced Rivera to eight months in prison.  Unlike Rivera, both Alford and Yoder demonstrated a lack of candor and honesty in their trial testimony.

In any event, the goal of minimizing unwarranted sentencing disparities in § 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The § 3553(a) factors that this Court assesses are "open-ended," with the result that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id*. at 1095.

## V.     Restitution

Under 18 U.S.C. § 3556, a sentencing court must determine whether and how to impose restitution in a federal criminal case. Because a federal court possesses no "inherent authority to order restitution," *United States v. Fair*, 699 F.3d 508, 512 (D.C. Cir. 2012), it can impose

restitution only when authorized by statute, *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C. Cir. 2011). First, the Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary authority to order restitution to victims of most federal crimes." *Papagno*, 639 F.3d at 1096; *see* 18 U.S.C. § 3663(a)(1)(A) (Title 18 offenses subject to restitution under the VWPA). Second, the Mandatory Victims Restitution Act ("MVRA"), Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA. *Papagno*, 639 F.3d at 1096. The MVRA applies to certain offenses including those "in which an identifiable victim or victims has suffered a physical injury or pecuniary loss," 18 U.S.C. § 3663A(c)(1)(B), a "crime of violence," § 3663A(c)(1)(A)(i), or "an offense against property … including any offense committed by fraud or deceit," § 3663A(c)(1)(A)(ii). *See Fair*, 699 F.3d at 512 (citation omitted). Because Yoder was convicted of a violation of an offense under Title 18, the VWPA does apply.

The applicable procedures for restitution orders issued and enforced under these two statutes is found in 18 U.S.C. § 3664. *See* 18 U.S.C. § 3556 (directing that sentencing court "shall" impose restitution under the MVRA, "may" impose restitution under the VWPA, and "shall" use the procedures set out in Section 3664).

Both [t]he VWPA and MVRA require identification of a victim, defined in both statutes as "a person directly and proximately harmed as a result of" the offense of conviction. *Hughey v. United States*, 495 U.S. 411, 418 (1990) (interpreting the VWPA). Both statutes identify similar covered costs, including lost property and certain expenses of recovering from bodily injury. *See Papagno*, 639 F.3d at 1097-97; 18 U.S.C. §§ 3663(b), 3663A(b). Finally, under both the statutes, the government bears the burden by a preponderance of the evidence to establish the amount of

loss suffered by the victim. *United States v. Bikundi*, 926 F.3d 761, 791 (D.C. Cir. 2019).

In deciding whether to impose restitution under the VWPA, the sentencing court must take account of the victim's losses, the defendant's financial resources, and "such other factors as the court deems appropriate." *United States v. Williams*, 353 F. Supp. 3d 14, 23-24 (D.D.C. 2019) (quoting 18 U.S.C. § 3663(a)(1)(B)(i)). The MVRA, by contrast, requires imposition of full restitution without respect to a defendant's ability to pay.[7]

Because the defendant in this case engaged in criminal conduct in tandem with hundreds of other defendants charged in other January 6 cases, and his criminal conduct was a "proximate cause" of the victims' losses if not a "cause in fact," the Court has discretion to apportion restitution and hold the defendant responsible for his individual contribution to the victims' total losses. *See Paroline v. United States*, 572 U.S. 434, 458 (2014) (holding that in aggregate causation cases, the sentencing court "should order restitution in an amount that comports with the defendant's relative role in the causal process that underlies the victim's general losses"). *See also United States v. Monzel*, 930 F.3d 470, 476-77, 485 (D.C. Cir. 2019) (affirming $7,500 in restitution toward more than a $3 million total loss, against a defendant who possessed a single pornographic image of the child victim; the restitution amount was reasonable even though the "government was unable to offer anything more than 'speculation' as to [the defendant's] individual causal contribution to [the victim's] harm"; the sentencing court was not required to "show[] every step of its homework," or generate a "formulaic computation," but simply make a "reasoned judgment.").

---

[7] Both statutes permit the sentencing court to decline to impose restitution where doing so will "complicat[e]" or "prolong[]" the sentencing process. *See* 18 U.S.C. §§ 3663(a)(1)(B)(ii), 3663A(c)(3)(B).

More specifically, the Court should require Yoder to pay $500 in restitution for his convictions on Counts One through Four. This amount fairly reflects Yoder's role in the offense and the damages resulting from his conduct. Moreover, in cases where the parties have entered into a guilty plea agreement, five hundred dollars has consistently been the agreed upon amount of restitution and the amount of restitution imposed by judges of this Court where the defendant was convicted of only misdemeanors and not directly and personally involved in damaging property. Accordingly, such a restitution order avoids sentencing disparity.

## VI.   Fine

Yoder's convictions under Counts One and Two subject him to a statutory maximum fine of $100,000, and his convictions under Counts Three and Four subject him to a statutory maximum fine of $5,000. *See* 18 U.S.C. § 3571(b)(3). In determining whether to impose a fine, the sentencing court should consider the defendant's income, earning capacity, and financial resources. *See* 18 U.S.C. § 3572(a)(1); *See* U.S.S.G. § 5E1.2(d). In assessing a defendant's income and earning capacity, a sentencing court properly considers whether a defendant can or has sought to "capitalize" on a crime that "intrigue[s]" the "American public." *United States v. Seale*, 20 F.3d 1279, 1284-86 (3d Cir. 1994).

A fine is appropriate in this case. As noted in the PSR, the defendant's sister created a "GiveSendGo" donations page for "Isaac Yoder aka George Washington Legal Defense" and has raised at least $16,646.  PSR at ¶ 90; *see also* Exhibit B (printout of GiveSendGo page as of March 8, 2023) (explaining that Yoder and members of his family "traveled to Washington DC to peacefully protest what we did then and still do believe to be a stolen election" and stating that

"[i]f this and many other cases against innocent people who were in DC on Jan are allowed to go forward, the government will not stop there.").[8]



**Figure 4:  Image of GiveSendGo page from Exhibit B**

The website indicates the funds "will be received by Isaac Yoder" and that Yoder "is quickly incurring significant financial debt from the efforts to defend himself." *Id.* However, since the inception of the case, Yoder has been represented by court-appointed counsel. *See* Aug. 9, 2021 Minute Order. Yoder should not be able to "capitalize" on his participation in the Capitol breach in this way.

## VII.    Conclusion

Sentencing requires the Court to carefully balance the § 3553(a) factors. Balancing these factors, the government recommends that this Court sentence Defendant to 13 months incarceration, 36 months' probation, 60 hours of community service, $500 in restitution, and a fine

---

[8] The government produced information regarding the page in discovery in March 2023, and the page was subsequently removed from the public.  Yoder acknowledged having a fundraising page in his July 2023 interview.

of $16,646, or the equivalent of the amount raised for Isaac Yoder relating to his criminal conduct

at the time of sentencing. Such a sentence protects the community, promotes respect for the law,

and deters future crime by imposing restrictions on his liberty as a consequence of his behavior.

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney
D.C. Bar No. 481052

By:   s/ *Sarah W. Rocha*
SARAH W. ROCHA
Trial Attorney / Detailee
D.C. Bar No. 977497
219 S. Dearborn Street, Fifth Floor
Chicago, Illinois 60604
(202) 330-1735
sarah.wilsonrocha@usdoj.gov

MICHAEL L. BARCLAY
Assistant United States Attorney
Member of N.Y. Bar
601 D Street, NW
Washington, D.C. 20530
(202) 252-7669
Michael.Barclay@usdoj.gov

## <u>CERTIFICATE OF SERVICE</u>

On this 18th day of August 2023, a copy of the foregoing was served upon all parties listed on the Electronic Case Filing (ECF) System.

<u> s/ *Sarah W. Rocha*</u>
Sarah W. Rocha
Trial Attorney