**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA** ) | |
| ) | |
| v. ) | **Case. No. 21-cr-505 (RCL)** |
| ) | |
| **ISAAC SAMUEL YODER** ) | |
| ) | |
| **Defendant.** ) | |

## EXPEDITED MOTION FOR AN INDICATIVE RULING ON A SENTENCE REDUCTION UNDER FEDERAL RULE OF CRIMINAL PROCEDURE 37

Isaac Samuel Yoder, through undersigned counsel, respectfully moves this Court for an indicative ruling under Federal Rule of Criminal Procedure 37 on whether it would reduce his term of imprisonment from 12 months to 8 months (modifying his projected release date from approximately August 18, 2024, to April 18, 2024), due to a retroactively applicable amendment to the U.S. Sentencing Guidelines impacting so-called "zero-point offenders."  *See* Amend. 821 (Part B), U.S.S.C. (eff. Nov. 1, 2023).  The government has indicated that it opposes this motion, stating that even if it conceded Mr. Yoder's eligibility under U.S.S.G. § 4C1.1, it would argue that his sentence should not be adjusted based on the 18 U.S.C. § 3553(a) factors.  Given that Mr. Yoder seeks a modification that may result in his release on April 18, 2024, which likely would impact his placement into a halfway house or home confinement at an even earlier date (perhaps immediately), he respectfully requests that the Court rule on this matter on an expedited basis.

1

## RELEVANT BACKGROUND

On May 26, 2023, following a bench trial, the Court found Mr. Yoder guilty of four misdemeanor offenses relating to January 6, 2021: (1) entering and remaining in a restricted building, in violation of 18 U.S.C. § 1752(a)(1) (Count 1); (2) disorderly and disruptive conduct in a restricted building, in violation of 18 U.S.C. § 1752(a)(2) (Count 2); disorderly conduct in a Capitol building, in violation of 40 U.S.C. § 5104(e)(2)(D) (Count 3); and (4) parading, demonstrating, or picketing in a Capitol building, in violation of 40 U.S.C. § 5104(e)(2)(G) (Count 4). *See* Dkt. 76 at 1-2 (Judgment).

At the time, the U.S. Sentencing Guidelines recommended 10 to 16 months' imprisonment, as he had a total offense level of 12 and zero criminal history points. *See* PSR ¶ 105. On August 25, 2023, this Court sentenced him to concurrent terms of 12 months' imprisonment, explaining that "because of the nature of you and your background and your good life you have lived, I think you earned somewhere in the midpoint[.]" Sent'g Tr. at 21:6-13, Dkt. No. 80 (Sep. 18, 2023); *see also* Dkt. 51 at 3. On September 5, 2023, Mr. Yoder timely appealed his judgment and sentence, *see* Dkt. No. 78, which remains pending with the D.C. Circuit, *see* No. 23-3151.

Mr. Yoder presently is incarcerated at MCFP Springfield in Springfield, MO. As of this writing, his projected release date is August 18, 2024, per the Bureau of Prisons' Inmate Locator feature at https://www.bop.gov/inmateloc/.

## ARGUMENT

### I.   Procedural Posture

As an initial point of clarification, this Court may entertain this motion while Mr. Yoder's case is on appeal in the D.C. Circuit.  The filing of a notice of appeal generally divests a district court of jurisdiction and therefore a district court cannot grant a motion without a remand.  *See, e.g.*, *Griggs v. Provident Consumer Disc. Co.*, 459 U.S. 56, 58 (1982); Fed. R. App. P. 4(b)(3).  But Federal Rule of Criminal Procedure 37 allows a district court to consider a motion and either "(1) defer considering the motion; (2) deny the motion; or (3) state either that it would grant the motion if the court of appeals remands for that purpose or that the motion raises a substantial issue."  Fed. R. Crim. P. 37(a); *see also United States v. Trabelsi*, No. 06-CR-89 (RDM), 2021 WL 430911, at *12 (D.D.C. Feb. 5, 2021), *aff'd*, 28 F.4th 1291 (D.C. Cir. 2022) ("Rule 37 of the Federal Rules of Criminal Procedure provides a mechanism for a district court that lacks jurisdiction over a pending motion for relief because of a pending appeal nevertheless to indicate how it would rule on the motion if it were to have jurisdiction.").  Mr. Yoder therefore requests that this Court issue an "indicative ruling" that it would grant the motion so that he may request that the D.C. Circuit issue a limited remand of the case under Federal Rule of Appellate Procedure 12.1(b).

II.     **Applicable Legal Standards**

Effective November 1, 2023, the United States Sentencing Commission

created a new guideline provision relating to criminal history at U.S.S.G. § 4C1.1

(Adjustment for Certain Zero-Point Offenders).  Section 4C1.1 provides for a two-

level decrease from the offense level for defendants who "did not receive any

criminal history points from Chapter Four, Part A" and are not otherwise excluded

under the Guideline.  United States Sentencing Commission, Amendments to the

Sentencing Guidelines (Apr. 27, 2023), at 87-88 (Part B, Subpart 1).[1]  On August 31,

2023, implementing the directive of 28 U.S.C. § 994(u), the Sentencing Commission

determined that the new § 4C1.1 would apply retroactively to defendants serving

terms of imprisonment.  See United States Sentencing Commission, Amendment to

the Sentencing Guidelines (Aug. 31, 2023)[2]; *see also* U.S.S.G. § 1B1.10 app. n.7.

18 U.S.C. § 3582(c)(2) provides that defendants serving terms of

imprisonment may receive sentence reductions pursuant to retroactive amendments

to the Sentencing Guidelines:

> [I]n the case of a defendant who has been sentenced to a term of
> imprisonment based on a sentencing range that has subsequently
> been lowered by the Sentencing Commission pursuant to 28 U.S.C.
> § 994(o), upon motion of the defendant or the Director of the Bureau
> of Prisons, or on its own motion, the court may reduce the term of
> imprisonment, after considering the factors set forth in section
> 3553(a) to the extent that they are applicable, if such a reduction is

---

[1]     Available     at     https://www.ussc.gov/sites/default/files/pdf/amendment-
process/reader-friendly-amendments/202305_RF.pdf.
[2]     Available     at     https://www.ussc.gov/sites/default/files/pdf/amendment-
process/reader-friendly-amendments/202308_RF-retro.pdf.

consistent with applicable policy statements issued by the Sentencing
Commission.

18 U.S.C. § 3582(c)(2)

In turn, U.S.S.G. § 1B1.10 – the applicable policy statement – provides that:

In a case in which a defendant is serving a term of imprisonment, and
the guideline range applicable to that defendant has subsequently
been lowered as a result of an amendment to the Guidelines Manual
listed in subsection (d) below, the court may reduce the defendant's
term of imprisonment as provided by 18 U.S.C. § 3582(c)(2).

U.S.S.G. § 1B1.10.  Section 1B1.10 further provides that, except under certain

circumstances, a court may not reduce a person's sentence "to a term that is less

than the minimum of the amended guideline range," and "[i]n no event may the

reduced term of imprisonment be less than the term of imprisonment the defendant

has already served."  U.S.S.G. § 1B1.10(b)(2).

"Courts follow a two-step approach when determining whether a sentence

reduction is warranted under 18 U.S.C. § 3582(c)(2)."  *United States v. Kelly*, No.

1:21-CR-708-RCL-1, 2024 WL 756642, at *3 (D.D.C. Feb. 23, 2024) (citing *Dillon v.

United States*, 560 U.S. 817, 826 (2010)).  "First, the court determines whether a

defendant is eligible for a sentence reduction and to what extent."  *Id.*  In doing so,

the court must calculate the amended guideline range in light of the relevant

amendment.  *Id.*  Then, "[i]f the defendant is eligible for a sentence reduction, the

court moves on to step two, which is 'to consider any applicable § 3553(a) factors

and determine whether, in its discretion, the reduction authorized by reference to

the policies relevant at step one is warranted in whole or in part under the particular circumstances of the case.'" *Id.* (quoting *Dillon*, 560 U.S. at 827).

### a. Mr. Yoder is eligible for the Zero-Point Offender Adjustment.

Mr. Yoder is eligible for a sentence reduction pursuant to 18 U.S.C. § 3582(c)(2) and § 1B1.10(b)(2). As explained, after Mr. Yoder's sentencing, the Sentencing Commission amended and made retroactive the sentencing guidelines to reduce the total offense level by two levels for defendants without any criminal history points, so long as the offense did not involve one of a list of specific aggravating factors. U.S.S.G. § 4C1.1(a). Mr. Yoder meets all the criteria, and it seems the government might not argue otherwise, instead resting its opposition on the § 3553(a) factors. In any event, Mr. Yoder addresses the only exclusions he imagines the government might raise in opposition: use of violence or credible threats of violence in connection with the offense (exclusion 3), and possession of a dangerous weapon in connection with the offense (exclusion 7).

Starting with whether Mr. Yoder "use[d] violence or credible threats of violence in connection with the offense," § 4C1.1(a)(3), there is no doubt that Mr. Yoder personally did not engage in any violence, nor did he threaten violence, on January 6. As this Court recently explained, "§ 4C1.1 and other guidelines provisions that use these terms do not define 'violence' or 'credible threats of violence,'" and so courts must ascertain the "plain meaning of these terms as evidenced by dictionary definitions." *Kelly*, 2024 WL 756642, at *6. In *Kelly*, this

6

Court referred to definitions of "violence" that require "'the use of physical force, usually accompanied by fury, vehemence, or outrage; especially, physical force unlawfully exercised with the intent to harm,'" or "the 'deliberate exercise of physical force against a person.'" *Id.* at *7 (quoting *Violence*, Black's Law Dictionary (11th ed. 2019), and *Violence*, Oxford English Dictionary (2014) (cleaned up)); *see also United States v. Bauer*, No. 121CR003862TNM, 2024 WL 324234, at *2 (D.D.C. Jan. 29, 2024) (similar); *United States v. Yang*, No. CR 23-100 (JDB), 2024 WL 519962, at *4 (D.D.C. Feb. 9, 2024) (similar). This Court further concluded that "[a] 'credible' threat of violence is one that 'offers reasonable grounds for being believed or trusted.'" 2024 WL 756642, at *7 (quoting *Credible*, Merriam-Webster, https://perma.cc/TYM4-KE3B).

This Court has already concluded that Mr. Yoder's actions on January 6 were "non-violent." Dkt. 65 at 15 (Findings of Fact and Conclusions of Law). And, based on a review of this Court's findings of fact, that contention was correct. There is no finding that Mr. Yoder either used physical force against anyone in the Capitol that day or threatened the use of physical force. To the contrary, the Court noted that Mr. Yoder "appeared to express some concern with the crowd 'rioting' and 'doing bad things.'" Dkt. 65 at 20. Those facts lie in stark contrast to the cases in which courts in this jurisdiction have declined to apply § 4C1.1 in January 6 cases. *See, e.g.*, *Kelly*, 2024 WL 756642, at *7 (holding § 4C1.1(a) inapplicable where defendant "deliberately used physical force against the body of a police officer"); *Bauer*, 2024

WL 324234, at *2-*4 (holding § 4C1.1(a) inapplicable where defendant shoved a police officer and made credible threats of violence against Speaker Pelosi); *accord Yang*, 2024 WL 519962, at *4 (holding § 4C1.1(a) applicable even though defendant twice made physical contact with officers because he "did not act with the degree of aggression necessary to fairly characterize his actions as 'violence'").

That Mr. Yoder did not personally engage in any violence should end the question of his eligibility under § 4C1.1(a)(3).  In other January 6 cases where the defendant did not personally engage in violence, however, the government has resisted application of § 4C1.1(a) on the theory that every rioter contributed to the general violence on January 6, and so § 4C1.1 ought not apply in any case.  *See, e.g.*, *Yang*, 2024 WL 519962, at *4.  Like other courts in this district, this Court should reject that overbroad interpretation of § 4C1.1(a).

Evaluating whether a defendant used or threatened to use violence requires an inquiry referencing that individual's specific criminal actions.  As Judge McFadden explained in *Bauer*, the Court must "evaluate with particularity whether the defendant used violence or made credible threats of violence[;] [i]t cannot simply impute the 'use of violence' to a defendant based on the actions of others."  2024 WL 324234, at *4; *see also Yang*, 2024 WL 519962, at *4 ("But it does not follow that the Court can disregard the inherently individualized analysis contemplated by § 4C1.1 in general and by the plain text of § 4C1.1(a)(3) in particular.").  Numerous judges in this district accordingly have "decline[d] to adopt the Government's broad guilt-

by-association interpretation of § 4C1.1." *Bauer*, 2024 WL 324234, at *4.; *see, e.g.*,
*Yang*, 2024 WL 519962, at *5 (noting that it "joins the view of at least six other
judges in this District," in "reject[ing] the government's violence-by-presence theory
of § 4C1.1(a)(3)"). Should the government press that argument here, Mr. Yoder
would urge this Court likewise to reject it.

Unable to show that Mr. Yoder used or threatened to use violence on January
6, the government may argue that Mr. Yoder is ineligible for the reduction because
he "possess[ed] . . . a firearm or other dangerous weapon . . . in connection with the
offense." U.S.S.G. § 4C1.1(a)(7). As noted in the Court's findings of fact, Mr. Yoder
"carr[ied] the American flag," and had a "costume sword hanging from his belt."
Dkt. 65 at 8. The Court further found that "Yoder was dressed in colonial attire in
the style of George Washington, including a tri-corn hat, overcoat, cravat, vest,
belts, pants, and boots," "[t]he sword was made of metal and had a point," and Mr.
Yoder "has worn historical costumes often, including for an advertisement on his
company's website and at times during work." Dkt. 65 at 5-6. In context, neither
the American flag nor the costume sword was a "dangerous weapon" that
disqualifies Mr. Yoder from benefitting under § 4C1.1.

Section 4C1.1(b)(1) provides that "[d]angerous weapon" has "the meaning
given . . . in the Commentary to § 1B1.1." That commentary defines "dangerous
weapon" as:

> (i) an instrument capable of inflicting death or serious bodily injury;
> or (ii) an object that is not an instrument capable of inflicting death

or serious bodily injury but (I) closely resembles such an instrument; or (II) the defendant used the object in a manner that created the impression that the object was such an instrument (*e.g.,* a defendant wrapped a hand in a towel during a bank robbery to create the appearance of a gun).

The two items at issue here – a flag and a costume sword – are not ordinarily thought of as dangerous weapons. Otherwise, those attending Comic-Con, trick-or-treating on Halloween, or attending a Revolutionary War reenactment would have much more to fear. But, as numerous courts have recognized, almost anything can be "capable" of inflicting serious bodily injury. *See, e.g., United States v. Serrata*, 425 F.3d 886, 910 (10th Cir. 2005) ("[I]n the proper circumstances, almost anything can count as a dangerous weapon, including walking sticks, leather straps, rakes, tennis shoes, rubber boots, dogs, rings, concrete curbs, clothes irons, and stink bombs.") (internal citation omitted); *United States v. Tolbert*, 668 F.3d 798, 802 (6th Cir. 2012) (collecting cases where courts "have adopted a more functional approach that examines how the particular object was used under the circumstances"); *United States v. Perry*, 284 F. App'x 56, 57 (4th Cir. 2008) ("Applying these standards of consideration to the present case, we find that, while the plastic food tray was not inherently dangerous, and, under other circumstances, was innocuous, Perry's use of the tray as an assaultive weapon was clearly capable of, and did, inflict serious injury."). Accordingly, the mere *capability* to cause harm cannot itself be enough. Rather, as those cases demonstrate, courts often look to the

surrounding circumstances when addressing whether an item not normally used as a weapon qualifies as a "dangerous weapon" in a particular case.

Applied here, the relevant circumstances clearly demonstrate that neither object qualifies as a "dangerous weapon" that should disqualify Mr. Yoder from benefitting from the two-level reduction. Critically, Mr. Yoder never used, attempted to use, or threatened to use either of these items as a weapon on January 6. Rather, these objects were part of Mr. Yoder's colonial era costume; an ensemble that is part of his family's way of life:



For similar reasons, even if the Court concluded that these items constituted "dangerous weapons," they were not possessed "in connection with" Mr. Yoder's offenses. As explained, Mr. Yoder's purpose in possessing these items on January 6

was to portray a Revolutionary War-era soldier, a costume Mr. Yoder has donned with some regularity.  There is no indication that Mr. Yoder contemplated using those items to breach the Capitol on January 6 or to commit any act of violence.

The purpose behind Mr. Yoder's possession of these items is particularly important to this contextual analysis.  For example, in *United States v. Franklin*, 484 F.3d 912, 913-16 (7th Cir. 2007), the Seventh Circuit concluded that a district court erred by applying a dangerous weapon enhancement to a pocketknife found in a vehicle alongside cocaine.  In support, the court noted that the knife was more likely used as part of the defendant's electrical business, rather than in connection with his drug offense.  Likewise, here, Mr. Yoder's possession of the flag and costume sword was part of a getup Mr. Yoder wore during various facets of his life, including his professional life.  *See* DKt. 65 at 5-6.  There is no evidence he possessed those items in order to aid his trespass into the Capitol.  The contrary proof is in his actions—the government has never alleged that Mr. Yoder pulled out the sword or otherwise used these items as weapons on January 6.

Finally, the government previously had signaled that it did not consider the items Mr. Yoder possessed on January 6 to be dangerous weapons.  *See Franklin*, 474 F.3d at 915-16 (noting that "the government executed a plea agreement with Franklin and did not seek a § 2D1.1(b)(1) enhancement as part of the calculations," and the police "did not confiscate" the knife, both suggesting that "the knife was not relevant to Franklin's offense").  The government charged Mr. Yoder with

12

misdemeanor violations under 18 U.S.C. § 1752.  *See* Dkt. 32 (Second Superseding

Information).  Had Mr. Yoder, "during and in relation to the offense, use[d] or

carrie[d] a deadly or dangerous weapon," the government instead could have sought

a felony charge under § 1752(b)(1)(A).  The government's decision not to pursue that

course, and instead to pursue only misdemeanors, suggests that it was not

particularly concerned about the items Mr. Yoder was carrying that day.[3]

Accordingly, because Mr. Yoder had zero criminal history points at

sentencing (PSR ¶ 63), and because none of the disqualifying criteria apply to his

case, Mr. Yoder is eligible for the zero-point offender reduction under U.S.S.G.

§ 4C1.1.

### b. A reduction in sentence is consistent with the 18 U.S.C. § 3553(a) factors.

Mr. Yoder respectfully requests that this Court exercise its discretion to

reduce his sentence from 12 months' imprisonment to 8 months' imprisonment.

This reduction would be in keeping with how this Court sentenced Mr. Yoder

originally: both his original Guidelines range and his new range span six months;

he was originally sentenced to 12 months, two months above the low-end of his

original Guidelines (PSR ¶ 105); and an 8-month sentence likewise would reflect a

---

[3] In its sentencing memorandum, the government argued in a footnote for a dangerous weapon enhancement due to the costume sword and the American flag. *See* Dkt. 71 at 11 n.5.  Because of the grouping analysis, the Court did not reach that argument at sentencing.  The PSR does not include any discussion of a dangerous weapons enhancement.

sentence two months above the low-end of his new range (6-12 months).  The

reduction sought is consistent with U.S.S.G. § 1B1.0 and the relevant 18 U.S.C.

§ 3553(a) factors.  The 4-month reduction is modest and yields a sentence that is

sufficient to meet the goals of sentencing in this case.

First, the proposed reduction is consistent with the need to protect the public

from future crimes.  In promulgating Amendment 821's provisions applicable to

zero-point offenders like Mr. Yoder, the Commission relied on studies of recidivism

among federal offenders which found that "offenders with zero criminal history

points have considerably lower recidivism rates than other offenders, including

offenders with one criminal history point."  United States Sentencing Commission,

*Amendments to the Sentencing Guidelines* (Apr. 27, 2023), at 79.[4]  Moreover, this

Court also imposed a 12-month period of supervised release, allowing this Court to

supervise Mr. Yoder through the 2024 presidential election and the next

inauguration.  *See* Dkt. 76 at 4.

Furthermore, in considering whether and to what degree a sentence

reduction is warranted under Amendment 821, "[t]he court may consider post-

sentencing conduct of the defendant that occurred after imposition of the term of

imprisonment."  U.S.S.G. § 1B1.10 app. n. 1(B)(iii).  Mr. Yoder's post-sentencing

conduct weighs heavily in favor of reducing his sentence in this case.

---

[4]     Available     at     https://www.ussc.gov/sites/default/files/pdf/amendment-
process/reader-friendly-amendments/202305_RF.pdf.

First, and most importantly, Mr. Yoder has no disciplinary record from his period of incarceration. *See* Ex. B at 4. Rather, Mr. Yoder has used his period of incarceration in a positive manner. Most impressively, Mr. Yoder has earned his GED while incarcerated, *id.* at 5, an impressive accomplishment for a 34-year-old who was homeschooled until high school and did not obtain that achievement as a teenager. Furthermore, Mr. Yoder is assigned to the "Carpenter Shop" detail at MCFP Springfield, where he uses his carpentry skills to make items for the Bureau of Prisons. He also plays the piano during prison church services. And, demonstrative of Mr. Yoder's desire to make amends, he has fully paid off his fine, restitution, and assessment (a total of $1,570). *See id.* at 6.

Finally, an 8-month sentence is well within the norm of sentences given to defendants who were convicted of the four standard January 6 misdemeanors only. *See, e.g.*, *United States v. Dropkin*, No. 21-cr-734 (JEB) (30 days' incarceration); *United States v. Rivera*, No. 21-cr-60 (CKK) (8 months' incarceration); *United States v. Brodnax*, No. 21-cr-350 (PLF) (5 months' incarceration); *United States v. Vargas-Santos*, No. 21-cr-47 (RDM) (4 months' incarceration); *United States v. Nassif*, No. 21-cr-421 (JDB) (7 months' incarceration); *United States v. Hager*, No. 21-cr-381 (TSC) (7 months' incarceration); *United States v. Griffith*, No. 21-cr-244 (CKK) (6 months' incarceration); *United States v. Rhine*, No. 21-cr-687 (RC) (4 months' incarceration); *United States v. Eicher*, No. 22-cr-38 (BAH) (2 months' incarceration); *United States v. MacAndrew*, No. 21-cr-730 (CKK) (3 months'

incarceration); *United States v. Ballenger*, No. 21-cr-719 (JEB) (4 months' incarceration); *United States v. Price*, No. 21-cr-719 (JEB) (45 days' incarceration).

<u>**CONCLUSION**</u>

For these reasons, Mr. Yoder asks this Court to (1) issue an indicative ruling under Federal Rule of Criminal Procedure 37 stating that it would reduce Mr. Yoder's term of imprisonment from 12 months to 8 months; and (2) issue that ruling on an expedited basis.

Respectfully Submitted,

A. J. KRAMER

Federal Public Defender for the
District of Columbia

by:_____s/_____
Molly Runkle
Assistant Federal Public Defender
625 Indiana Avenue, NW
Washington D.C. 20004
202-208-7500
molly_runkle@fd.org