UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **UNITED STATES OF AMERICA**<br><br>v.<br><br>**ISAAC YODER,**<br><br>Defendant. | Case No. 21-CR-505 (RCL) |

**GOVERNMENT'S OPPOSITION TO DEFENDANT'S MOTION
FOR INDICATIVE RULING ON SENTENCING REDUCTION**

The United States, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this opposition to the defendant's motion for an indicative ruling that this Court would grant a four-month sentence reduction based on the newly enacted U.S.S.G. § 4C1.1. ECF No. 83. For the following reasons, defendant's sentence should not be modified.

**I.   FACTUAL BACKGROUND**

**A.  Offense Conduct**

Isaac Yoder, a self-employed locksmith, carried a flagpole with an American flag and dressed "in the colonial attire in the style of George Washington" with a metal sword "hanging in a scabbard at his belt" inside the U.S. Capitol building on January 6, 2021. Findings of Fact and Conclusions of Law, ECF No. 65 at 5-6. Earlier in the day, Yoder attended then-President Trump's "Stop the Steal" rally, but he watched the speeches from an area near the Washington Monument and outside of the magnetometers set up for security at the "Stop the Steal" rally. *Id.* at 6. After the speeches, he walked to where his family's vehicle was parked. He met up with his family and learned they had been hit by rubber bullets and pepper spray. *Id.* His brothers told him, "[i]t's bad," "Pence folded," and that people had broken into the Capitol. *Id.* Yoder responded by leaving his

family and going towards the Capitol—moving around barricades and against the flow of the crowd leaving the area.

Yoder climbed scaffolding that had been erected in connection with the construction of the inaugural stage and made his way to the entrance of the Senate Wing Door at approximately 3:14 p.m. "As he entered the Senate Wing Door, Yoder saw broken glass and a broken door," as well as people entering and exiting through windows. *Id.* at 7-8. Yoder "smelled pepper spray or tear gas" and "heard a loud beeping noise" – that is, a blaring alarm. *Id.* at 8.

Nevertheless, "Yoder climbed atop a pile of broken wooden furniture [and] swung his flag around[.]" *Id.* at 9. Yoder narrowly missed hitting rioters behind him with the flagpole.



*Figure 1: Screenshot of Yoder with the flagpole and sword at his waist from Trial Ex. 304*

Yoder yelled to encourage other rioters: "We've been so weak. We've lost any kind of credibility because all we ever do is cave. We don't riot. We don't do bad things. We keep the law." *Id.* at 9. He then got down from the furniture, posed for pictures with other rioters, and walked to the Crypt. *Id.* at 9. "After circulating around the Crypt for some time, Yoder encountered a USCP officer who expressly asked him to leave, a request with which Yoder complied." *Id.* at

9. Yoder left the Capitol at 3:33 p.m. through the same Senate Wing Door he had entered, having spent approximately 20 minutes in the Capitol building. *Id.*

### B. Procedural History

On July 29, 2021, the United States charged Yoder by criminal complaint with violating 18 U.S.C. §§ 1752(a)(1) and (2) and 40 U.S.C. §§ 5104(e)(D) and (G). On August 4, 2021, Yoder was arrested in Springfield, Missouri. On August 4, 2021, the United States charged Yoder by a four-count Information with violating 18 U.S.C. §§ 1752(a)(1) and (2) and 40 U.S.C. §§ 5104(e)(D) and (G). The Information was superseded on February 25, 2022, and superseded a second time on March 11, 2022.

Yoder appeared before this Court for a bench trial on March 20 and 21, 2023. Yoder asserted his Constitutional rights to testify and present evidence. On May 26, 2023, this Court issued its Findings of Fact and Conclusions of Law (ECF 65), finding Yoder guilty on all four counts.

On August 25, 2023, after submissions and arguments by both parties, pursuant to the Sentencing Reform Act of 1984 and in consideration of the provisions of Section 3553(a), this Court sentenced Yoder to 12 months of incarceration, followed by a 12-month term of supervised release. *See* Sentencing Tr. 8/25/23, ECF No. 80 at 21-22. The Court determined that Yoder's total offense level was 12, based on a base offense level of 10 pursuant to U.S.S.G. § 2A2.4 and two additional points for obstructing the administration of justice for his false testimony at trial pursuant to U.S.S.G. § 3C1.1(a), yielding a Guidelines range of 10 to 16 months. *Id.* at 4.

In setting forth its reasons for this sentence, the Court explained that because of the "serious" nature of Yoder's offenses, a sentence at the top of the guidelines range would be "appropriate," but that due to the defendant's "background" and "good life," a mid-point sentence

was warranted. *Id.* at 21-22. The Court further explained its sentence stating that it "has to respond to this day's events by saying these are serious events and serious crimes" and "we were on the precipice of actual disorder in the Capitol that would have led to the falling of the government itself that day." *Id.*

Yoder surrendered to the Bureau of Prisons on October 4, 2023.

On March 15, 2024, Yoder filed a motion for "an indicative ruling under Federal Rule of Criminal Procedure 37 on whether [this Court] would reduce his term of imprisonment from 12 months to 8 months[.]" ECF No. 83. To date, Yoder has been incarcerated for approximately six months, with a projected release date of August 18, 2024.

## II.     RETROACTIVE APPLICATION OF U.S.S.G. § 4C1.1

U.S.S.G. § 4C1.1 provides for a two-level reduction for offenders with no criminal history points who are not subject to any of ten exclusionary criteria, including:

1. § 4C1.1(a)(3): the defendant did not use violence or credible threats of violence in connection with the offense;
2. § 4C1.1(a)(7): the defendant did not possess, receive, purchase, transport, transfer, sell, or otherwise dispose of a firearm or other dangerous weapon (or induce another participant to do so) in connection with the offense.

Section 4C1.1 may be applied retroactively to previously sentenced inmates, pursuant to U.S.S.G. § 1B1.10. Such a reduction may occur as provided in 18 U.S.C. § 3582(c)(2), which provides:

> [I]n the case of a defendant who has been sentenced to a term of imprisonment based on a sentencing range that has subsequently been lowered by the Sentencing Commission pursuant to 28 U.S.C. 994(o), upon motion of the defendant or the Director of the Bureau of Prisons, or on its own motion, the court may reduce the term of imprisonment, after considering the factors set forth in section 3553(a) to the extent that they are applicable, if such a reduction is consistent with applicable policy statements issued by the Sentencing Commission.

Accordingly, a reduction pursuant to U.S.S.G. § 1B1.10 is not mandatory. Instead, a "court *may* reduce the term of imprisonment, after considering the factors set forth in section 3553(a)." 18 U.S.C. § 3582(c)(2) (emphasis added). Additionally, any proceeding under Section 3582(c)(2) is not a full resentencing, so a court is not permitted to reconsider other sentencing determinations left unaltered by the Section 4C1.1 amendment. *Dillon v. United States*, 560 U.S. 817, 825-826 (2010); U.S.S.G. § 1B1.10(a)(3).

A court considering a motion for a sentence reduction due to § 4C1.1 must follow a two-step process. *Id.* at 826. First, the court must determine whether the defendant is eligible for a sentence reduction. A defendant is only eligible under § 4C1.1 reduction if: (1) the defendant has no criminal history points; (2) the defendant is not subject to any of the exclusionary criteria; (3) the amended guidelines range is lower than the range applied at the original sentencing hearing; and (4) the defendant did not previously receive a sentence at or below the bottom of the now-amended range other than for providing substantial assistance. *See* U.S.S.G. §§ 1B1.10, 4C1.1; *Dillon v. United States*, 560 U.S. at 827.

Even if step 1 is satisfied, a sentencing reduction is not required. Instead, § 1B1.10 directs that before reducing a defendant's sentence, the court must "consider the factors set forth in 18 U.S.C. § 3553(a) in determining … whether a reduction in the defendant's term of imprisonment is warranted" as well as "the extent of such a reduction." U.S.S.G. § 1B1.10 app. note 1(B)(i), (ii); *see also id.* Background ("The authorization of such a discretionary reduction ... does not entitle a defendant to a reduced term of imprisonment as a matter of right.").

In particular, the court must consider public safety considerations, and may consider information regarding the post-sentencing conduct or situation of the defendant, whether positive or negative. *See, e.g., United States v. Darden*, 910 F.3d 1064, 1068 (8th Cir. 2018). Section 1B1.10

application note 1(B)(ii) directs that "[t]he court shall consider the nature and seriousness of the danger to any person or the community that may be posed by a reduction in the defendant's term of imprisonment." Application note 1(B)(iii) further directs that "[t]he court may consider post-sentencing conduct of the defendant that occurred after the imposition of the original term of imprisonment." That means the court may, but is not required, to consider the defendant's post-sentencing rehabilitation, if any. *See United States v. Rodriguez-Rosado*, 909 F.3d 472, 481 (1st Cir. 2018); *United States v. Banderas*, 858 F.3d 1147, 1150 (8th Cir. 2017).Such conduct would include social media posts and other statements relating to the Capitol riot on January 6, 2021.

If the court decides in its discretion to grant a reduction in sentence, it generally may not reduce the term of imprisonment to a term that is less than the minimum of the new guideline range. U.S.S.G. § 1B1.10(b)(2)(A).  Thus, the court may not reduce the sentence below the range provided by the amended guideline, and "in no event may the reduced term of imprisonment be less than the term of imprisonment the defendant has already served." U.S.S.G. § 1B1.10(b)(2)(C).

### III.    NO SENTENCING REDUCTION IS WARRANTED

**A.    Yoder is not eligible for a reduction under § 4C1.1 because he possessed a dangerous weapon.**

Yoder is not eligible for the sentencing reduction under the Section 4C1.1 amendment because he possessed a metal sword and wielded a flagpole – both dangerous weapons under U.S.S.G. § 1B1.1 cmt. n.1.  *See* U.S.S.G. § 4C1.1(a)(7).

Under Section 1B1.1, a dangerous weapon is (i) an instrument capable of inflicting death or serious bodily injury; or (ii) an object that is not an instrument capable of inflicting death or serious bodily injury but (I) closely resembles such an instrument or (II) the defendant used the object in a manner that created the impression that the object was such an instrument.  U.S.S.G. § 1B1.1 app. n.1(E).

In this case, Yoder possessed two dangerous weapons. First, Yoder carried a metal sword with a point, which is either "capable of inflicting death or serious bodily injury" or "closely resembles such an instrument." A sword is defined as "[a] weapon adapted for cutting and thrusting" with a handle, blade, and point. *Sword*, *Oxford English Dictionary* (December 2023, https://doi.org/10.1093/OED/4538023067; *see also* Sword, Merriam-Webster.com Dictionary, https://www.merriam-webster.com/dictionary/sword (defining a sword as "a weapon . . . with a long blade for cutting or thrusting"). Courts have found knives and other metal pointed objects to be dangerous weapons in other January 6 cases. *See United States v. Sullivan*, 21-cr-78 (RCL) (ECF No. 120) (jury instructions for various dangerous weapon charges); *see also United States v. Roe*, 23-cr-277 (CKK) (ECF No. 28) (determining that a metal pitchfork with pointed tips was a dangerous weapon for purposes of U.S.S.G. § 2A2.2(b)(2)(C)). Whereas knives can be tools, swords, like firearms, are exclusively weapons. Even more so than a knife, a metal sword with a point is either an instrument "capable of inflicting death or serious bodily injury" or it "closely resembles such an instrument."

Yoder also carried a wooden flagpole. Video and photo evidence shows that the flagpole was taller than Yoder. Yoder's flagpole, like flagpoles carried by other defendants on January 6, are instruments "capable of inflicting . . . serious bodily injury." *See United States v. Southard-Rumsey*, 21-cr-00387-APM (ECF No. 72 at 18-21, 74-75) (finding "solid wooden flagpole that probably looked like it was at least 5 to 6 feet in length" was a dangerous weapon under U.S.S.G. § 2A2.2(b)(2)(B))*; see also United States v. Michael Steven Perkins,* 21-cr-00447-CJN-4 (ECF No. 279 at 8, 16, 51) (applying dangerous weapon enhancements for flagpole pursuant to U.S.S.G. § 2A2.4(b)); *United States v. Thomas Webster*, 21-cr-00208-APM (ECF No. 124 at 19) (calculating

guidelines and applying enhancement for flagpole used as a dangerous weapon under U.S.S.G. § 2A2.2(b)(2)).

Defendant's motion argues that he did not use the items offensively and the "surrounding circumstances" indicate the items were not dangerous. His argument appears to conflate the definition of a dangerous weapon pursuant to U.S.S.G. § 1B1.1—the definition relevant to U.S.S.G. § 4C1.1—with the requirements for the specific offense characteristics enhancements in U.S.S.G. § 2A2.2(b)(2). Section 4C1.1 focuses on possession and the nature of the instrument(s), not the manner of use. And it is clear that both a sword and a large wooden pole are capable of inflicting death or serious bodily injury.

Nevertheless, Yoder contends that these items cannot be considered dangerous weapons because "those attending Comic-Con, trick-or-treating on Halloween, or attending a Revolutionary War reenactment" do not ordinarily think of them as such, ECF 83 at 10, and Yoder wore his sword on other occasions, *id.* at 11. Whether others have possessed similar items in a non-criminal context[1] or whether the defendant routinely carried a sword at his belt and a wooden pole does not change the inherent nature of the items and their capability for harm or close resemblance to an

---

[1] The government also notes that, contrary to defendant's supposition, metal swords are not permitted at Comic-Con. *See* Convention Policies – Comic-Con (Apr. 8, 2024), https://www.comic-con.org/cc/plan-your-visit/convention-policies/ ("No functional props or weapons are allowed at Comic-Con."); *see also* Bag Inspection Policy & Prohibited Items, Mount Vernon (Mar. 27, 2024), https://www.mountvernon.org/plan-your-visit/tips-for-your-visit/guidelines/bag-inspection-policy-prohibited-items/ (strictly prohibiting "[k]nives/blades longer than 3.5 inches" and other items). Similarly, as testimony at trial established, large poles and swords are prohibited at the U.S. Capitol. *See* Mar. 20, 2023 Trial Tr. at 48-49, 81-82 (even replica items are "not something that we would let inside the building"); Mar. 21, 2023 Tr. at 243 (describing screening procedures and additional security procedures, including an "escort[] by our SWAT-type team" if a replica sword were to be used at a hearing or other official Congressional business). The obvious reason for this is because such items are capable of inflicting serious bodily injury, or causing the same level of alarm due to their close resemblance to an instrument with such capability.

instrument capable of causing serious bodily injury. In any event, Yoder was well-aware of the security risk and danger presented by these weapons. At the rally, Yoder chose to remain outside the secure area where speakers and many audience members were located, entry into which would have required him to pass through magnetometers and other security protocols.

Further, Yoder possessed these weapons in connection with his offenses. Before he went towards the Capitol, Yoder was advised of the potential for violence to occur: He knew rubber bullets and pepper spray had been deployed. He did not leave the sword or the flagpole with his family; he chose to bring them with him. And prior to entering the Senate Wing Door, he heard the building's alarm and saw rioters going through the broken windows. Thus, the context for him carrying the flagpole and sword was his participation in an attack during which law enforcement officers were brutally assaulted and which "endangered hundreds of federal officials in the Capitol complex." *United States v. Judd*, 21-cr-40, 2021 WL 6134590, at *5 (D.D.C. Dec. 28, 2021).

Courts have interpreted "possession in connection with the offense" broadly. For example, U.S.S.G. § 2D1.1(b)(1) applies a 2-point enhancement "[i]f a dangerous weapon (including a firearm) was possessed." Application note 11 to that section provides that, " [t]he enhancement should be applied if the weapon was present, unless it is clearly improbable that the weapon was connected to the offense." Many courts have concluded that defendants who received enhancements under U.S.S.G. § 2D1.1(b)(1) are not eligible for sentence reductions under U.S.S.G. § 4C1.1. *See, e.g., United States v. Kerr*, No. CR 21-1938 RB, 2024 WL 1329444 (D. N.M. Mar. 28, 2024) (firearm in defendant's purse in connection with possession with intent to distribute fentanyl and heroin charges); *United States v. Johnson*, No. 2:22-cr-129-01, 2024 WL 898910 (S.D. W. Va. Mar. 1, 2024) (firearms found at defendant's home during execution of search warrant). *See also United States v. Villasenor*, No. 18-cr-00437-SI-1, 2024 WL 1117940 at * 1

(N.D. Cal. Mar. 13, 2024) (denying reduction pursuant to Section 4C1.1 for defendant who possessed multiple firearms when arrested, but for whom the plea agreement did not contain a Section 2D1.1(b)(1) enhancement).

In *United States v. Agor,* the Court applied an enhancement pursuant to U.S.S.G. § 2B1.1(b)(16)(B) to a defendant convicted of currency theft who routinely carried knives for protection and as a "cutting implement," but who did not use the knife in a threatening manner. No. 21-00136 HG-01, 2023 WL 8780649 at *3-4 (D. Haw. Dec. 19, 2023). The Court denied a sentencing reduction pursuant to 4C1.1(a) on the same grounds. *Id.* at *5. Yoder similarly "has not demonstrated that he did not possess a . . . dangerous weapon in connection with the offense as set forth in Section 4C1.1(a)(7)," and his sentence should not be modified.

Moreover, under the totality of the circumstances, it was foreseeable that bringing the items inside the Capitol and wielding the flagpole around as Yoder did posed dangers to the people and property inside. *See United States v. Andrulonis*, No. 23-cr-085 (BAH), Sentc'g Hrg. Tr. at 11-12 ("In other words, evaluating a defendant's offense conduct requires examination of all the factors of the offense including what the particular defendant being sentenced did; where he was; what he was seeing; what a person would reasonably understand was the volatility of the situation; the threat that whole situation would pose to others; the foreseeable harm of the situation; and the consequences of the specific defendant's individualized actions."). When Yoder climbed on the broken furniture and swiveled his flagpole, he startled other rioters and narrowly avoided hitting them. *See* Trial Ex. 304. Yoder did not even look to see whether other people were in the way before swinging the pole around.

This is precisely why, at sentencing in this case, the government sought a dangerous weapons enhancement. ECF 71 at 11 n.5.[2] Yoder's argument that, more than seven years ago, in another circuit, in different context, the government did not seek the enhancement is beside the point. *See* ECF 83 at 12-13 (referencing *United States v. Franklin*, 484 F.3d 912 (7th Cir. 2007), in which the government did not include a 2-point enhancement pursuant to U.S.S.G. § 2D1.1(b)(1) in its plea agreement with the defendant when law enforcement had observed a pocketknife in the defendant's van during a search for narcotics).[3]

Defendant also suggests that if the government believed the items were dangerous weapons, the government would have sought additional charges. *See* ECF 83 at 13. Yoder was not charged with violations of 18 U.S.C. § 1752(b)(1)(A), which requires that the defendant "during and in relation to the offense, use[] or carr[y] a deadly or dangerous weapon." 18 U.S.C. § 1752(b)(1)(A).[4] Section 4C1.1(a)(7), in contrast, requires only that the defendant possess the weapon. His argument also ignores the evidence at trial from law enforcement witnesses about how the certification was halted because of the dangers posed on January 6 by the rioters. *See, e.g.* Mar. 20, 2023 Tr. at 29-30 (security sweeps conducted "to make sure that there were no weapons or anything of harm" before Vice President could return to the proceedings).

---

[2] The requested enhancement did not impact the Guidelines calculation.

[3] Further, in *Franklin*, the Court held that the application of the enhancement was erroneous because there was evidence that the defendant kept the knife in his van "on a permanent basis," *Franklin*, 484 F.3d at 916, the government did not dispute that the defendant possessed the knife in connection with his business as an electrician, *id.*, and the district court's grounds for disregarding the defendant's testimony on the issue misconstrued that testimony, *id.* at 915. Yoder's facts are different. He was not pulled over by police and found with sword and a flagpole in his vehicle. He chose to bring these weapons into a volatile and violent situation and into a building in which he had no authority to be.

[4] For items are not inherently or obviously deadly or dangerous, courts have also required that "defendant carried [the item] with the intent that it be used in a manner capable of causing serious bodily injury or death." *United States v. Christie*, 23 Cr. 05 (APM), ECF 64 at 3 (Aug. 3, 2023). *See also United States v. Jones*, 21 Cr. 213 (RJL), ECF 75 at 5-6 (July 27, 2023).

In sum, both the sword and flagpole that Yoder carried were dangerous weapons pursuant to U.S.S.G. §1B1.1 app. n.1(E). Accordingly, Yoder is ineligible for a sentencing reduction under the Section 4C1.1 amendment.

### B. Even if the Court determines that § 4C1.1 applies, it should not reduce Yoder's sentence.

"The grant of authority to the district court to reduce a term of imprisonment is unambiguously discretionary," even when the guideline range is actually reduced. *United States v. Vautier*, 144 F.3d 756, 760 (11th Cir. 1998). A district court has "substantial discretion" in deciding whether to reduce a sentence. *United States v. Young*, 555 F.3d 611, 614 (7th Cir. 2009). Accordingly, many courts have denied sentence reductions even in situations where guideline amendments lowered the sentencing ranges. *See, e.g.*, *United States v. Strand*, 21-cr-085 (CRC), ECF No. 150 at 7-8; *United States v. Wilson*, 716 F.3d 50, 53 (2d Cir. 2013).

Here, the Section 3553(a) factors counsel against granting a sentence reduction. Yoder's sentence reflects the nature and circumstances of the offense, as well as the need for the sentence imposed to reflect the seriousness of the offense and promote respect for the law. Yoder made multiple choices on January 6: to go towards the Capitol despite rubber bullets and tear gas; to climb scaffolding as he approached; to bring two dangerous weapons with him; to ignore the blaring alarm, broken glass, and rioters entering and exiting through the window; to climb on broken furniture, swing around his flagpole and yell to encourage rioters; and to continue to penetrate the Capitol by traveling to the Crypt. The Court explained in pronouncing its sentence that despite Yoder's "extraordinary background" and "the good life [he has] lived," a 12-month sentence was sufficient, but not greater than necessary, to comply with the purposes of sentencing "because of the serious nature" of his conduct. ECF 80 at 18, 21. As this Court explained, "[t]he

Court has to respond to this day's events by saying these are serious events and serious crimes." ECF 80 at 22.

Yoder has never taken responsibility for his actions and has shown no remorse, even following his conviction and sentencing. He testified falsely and minimized his conduct at trial, demonstrating a disrespect for the Court, the judicial process, and the governing institutions of this country. *See United States v. Bauer*, No. 21-cr-386-2 (TNM), ECF No. 195 at 9-10 (holding that, even if the defendant had been eligible for a sentence reduction, the Court would decline to exercise its discretion to resentence Bauer because, among other things, Bauer "perjured himself on the stand" and "showed a disrespect for the governing institutions of this country that [the Court] could not ignore."). The Court applied two additional points for obstructing the administration of justice for Yoder's false testimony at trial pursuant to U.S.S.G. § 3C1.1(a). ECF No. 80 at 4. Yoder falsely testified that he believed law enforcement had the situation under control, and therefore he was permitted to enter the Capitol. He also attempted to downplay the specifics of what he observed when questioned at trial and minimize their importance. For example, he misleadingly claimed that although he thought the blaring alarm at the Senate Wing Door "probably had something to do with what was going on . . . [with] the breach," he testified it did not deter him because it was "sort of a beeping" and "it wasn't very significant." Trial Tr. at 362. He also claimed that he climbed on broken furniture and yelled to the other rioters as a way to calm the situation. The Court rejected this claim, finding that "to the extent that Yoder's testimony suggests he did not understand himself to be joining the crowd within the Capitol to protest the election results, the Court did not credit that testimony." ECF No. 65 at 9.

And, in public statements after the trial and after his sentencing, Yoder has engaged in baseless accusations about his case, including questioning this Court's impartiality. He has filmed

at least two videos posted on the Internet in which he makes such statements. *See* "A Perfect Metaphor of Our Time: Biden Regime Sentences 'George Washington' to One Year in Prison for Walking inside US Capitol—Then Steals His Clothes (VIDEO) . . . Please Donate Below" (available at https://www.thegatewaypundit.com/2023/09/story-our-time-biden-regime-sentences-george-washington/) [hereinafter Gateway Pundit Video]; Joe Oltmann and David Clements Live with Isaac Yoder: J6, Justice for All, Election Interference - FrankSpeech (available at https://frankspeech.com/Video/joe-oltmann-and-david-clements-live-with-isaac-yoder-j6-justice-for-all-election-interference) [hereinafter FrankSpeech Video]. He alleged "blatant disregard" for court procedures at trial and suggested that the Court's verdict and sentencing determination was not based on the evidence presented. FrankSpeech Video at 42 (describing trial); Gateway Pundit Video at 28:15-29:15 ("He still found me guilty of all four counts, but I wonder how much of that . . you know that's kind of speculation, was that him or did he just sign off on something?"); *id.* 33:10-15 ("[I]t's like he's got orders to find me guilty or something"). He claimed his prosecution was "way outside the bounds of anything that even looks like justice—it's just persecution," Gateway Pundit Video at 35-38, and he agreed with a characterization of him as "a political prisoner for a year," FrankSpeech Video at 22-24. *See also* Gateway Pundit Video at 35-38 (appearing to agree with speaker stating sentence was "criminal" and "complete tyranny").

In his motion, Yoder points to other sentences given to defendants charged with misdemeanors. ECF No. 83 at 15. However, Section 3553(a)(6) does not limit the sentencing court's broad discretion "to impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing. 18 U.S.C. § 3553(a). After all, the goal of minimizing unwarranted sentencing disparities in Section 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the

sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The "open-ended" nature of the Section 3553(a) factors means that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008).

Moreover, Yoder's conduct, both on January 6, 2021 and afterwards, set him apart from the defendants in the cases he cites. For example, in *United States v. Lawrence Dropkin Jr.*, 21-cr-00737-JEB, the defendant promptly accepted responsibility for his actions and he appeared to be sincerely remorseful. Even though Yoder was convicted of the same four charges as the defendant in *United States v. Rivera*, No. 1:21-cr-00060-CKK, Yoder was more culpable because he demonstrated a lack of candor and honesty in his trial testimony. Moreover, unlike *Dropkin, Rivera* and other cases cited, Yoder posed potential additional dangers to police and other rioters because of the dangerous weapons, and he showed disrespect for government property when he stood on top of broken furniture and yelled to encourage other rioters.

In addition, the 3553(a) factors counsel against a sentence reduction for the further reason that the January 6 riot was a violent attack that threatened the lives of legislators and their staff, interrupted of the certification of the 2020 Electoral College vote count, did irrevocable harm to our nation's tradition of the peaceful transfer of power, caused more than $2.9 million in losses, and injured more than one hundred police officers, causing serious bodily injury in many cases. Every rioter, whether or not they personally engaged in violence or personally threatened violence, contributed to this harm. *See, e.g., United States v. Rivera*, 21-cr-60 (CKK), ECF No. 62 at 13 ("Just as heavy rains cause a flood in a field, each individual raindrop itself contributes to that flood. Only when all of the floodwaters subside is order restored to the field. The same idea applies

in these circumstances. Many rioters collectively disrupted congressional proceedings and each individual rioters contributed to that disruption. Because [defendant's] presence and conduct in part caused the continued interruption to Congressional proceedings, the court concludes that [the defendant] in fact impeded or disrupted the orderly conduct of Government business or official functions").

Finally, the government notes that the Sentencing Commission enacted § 4C1.1 based on recidivism data for offenders released in 2010. *See* U.S. SENT'G COMM'N, RECIDIVISM OF FEDERAL OFFENDERS RELEASED IN 2010 (2021), available at https://www.ussc.gov/research/research-reports/recidivism-federal-offenders-released-2010. Given the unprecedented nature of the Capitol attack, there is no reason to believe this historical data is predictive of recidivism for defendants who engaged in acts of political extremism on January 6. This is particularly so given the degree to which individuals, including defendants who have been sentenced, continue to propagate the same visceral sentiments which motivated the attack. *See, e.g.*, *United States v. Little*, No. 21-cr-315 (RCL), ECF No. 73 at 4 ("The Court is accustomed to defendants who refuse to accept that they did anything wrong. But in my thirty-seven years on the bench, I cannot recall a time when such meritless justifications criminal activity have gone mainstream.").

Thus, due to the unique nature of the January 6 riot, the harms caused by the January 6 riot, and the significant need to deter future mob violence, the government submits that even if the Court finds that § 4C1.1 applies, the Court should nevertheless deny defendant's motion for a sentence reduction. Such treatment would recognize the unique nature of the criminal events of

January 6, 2021, coupled with the overwhelming need to ensure future deterrence, despite a person's limited criminal history.

                Respectfully submitted,

                MATTHEW M. GRAVES
                United States Attorney
                D.C. Bar No. 481052

By:   */s/ Sarah W. Rocha*
       SARAH W. ROCHA
       Trial Attorney / Detailee
       D.C. Bar No. 977497
       601 D Street, NW
       Washington, D.C. 20530
       (202) 330-1735
       sarah.wilsonrocha@usdoj.gov

       MICHAEL L. BARCLAY
       Assistant United States Attorney
       N.Y. Bar No. 5441423
       601 D Street, NW
       Washington, D.C. 20530
       (202) 252-7669
       Michael.Barclay@usdoj.gov

**CERTIFICATE OF SERVICE**

On this 8th day of April 2024, a copy of the foregoing was served upon all parties listed on the Electronic Case Filing (ECF) System.

/s/ *Sarah W. Rocha*
SARAH W. ROCHA
Trial Attorney