## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| **UNITED STATES OF AMERICA** | |
| **v.** | **Case No. 21-cr-505 (RCL)** |
| **ISAAC SAMUEL YODER**, | |
| *Defendant.* | |

## <u>MEMORANDUM ORDER</u>

On January 6, 2021, Isaac Samuel Yoder stormed the U.S. Capitol armed with a metal sword and a wooden flagpole. Findings of Fact and Conclusions of Law ("FOF") 5–6, ECF No. 65. After a two-day bench trial, this Court found Yoder guilty of multiple offenses and sentenced him to a year of incarceration followed by a year of supervised release. *Id.* at 21; J. 4–5, ECF No. 76. Yoder now argues that his sentence should be reduced based on an amendment to the Sentencing Guidelines that provides an offense level reduction for certain offenders with zero criminal history points. Def.'s Mot., ECF No. 83; U.S.S.G. § 4C1.1. Critically however, that amendment does not authorize sentence reductions for individuals who bore dangerous weapons in connection with their offenses. *See* U.S.S.G. § 4C1.1.

Because Yoder carried a sword when he stormed our nation's Capitol, he is ineligible for a sentence reduction. Moreover, even if he were eligible, this Court would not exercise its discretion to reduce Yoder's sentence after consideration of the applicable 18 U.S.C. § 3553(a) factors. Yoder has failed to persuade this Court to disturb its carefully considered sentence. Accordingly, upon consideration of Yoder's Motion, ECF No. 83, the government's Response, ECF No. 87, and Yoder's Reply, ECF No. 92, the Court **DENIES** Yoder's motion for an indicative ruling on a sentence reduction, ECF No. 83.

1

## I.   BACKGROUND

The Court has previously summarized Yoder's conduct in significant detail. *See* FOF. Thus, the Court will assume familiarity with Yoder's case and recount only those facts and procedural details necessary to resolve the motion now before it.

On January 6, 2021, Yoder dressed himself in colonial attire, equipped himself with a flagpole and a pointed metal sword, and joined the mob of rioters storming the U.S. Capitol building. FOF 5–6. Before heading to the Capitol, Yoder attended former President Trump's rally at the Ellipse—which he had traveled from Missouri to Washington, D.C. with his family to observe. *Id.* Due to the items he carried with him, Yoder did not enter the secure area for the rally speech. *Id.* at 6. After the rally, Yoder's family members informed him that "there was trouble up at the Capitol," that there was an "altercation between police and people" involving rubber bullets and pepper spray, and that people had "broken into the Capitol doors." *Id.* at 7. In response, Yoder immediately headed towards the Capitol building, sidestepping barricades and climbing scaffolding until he made it onto the West Front of the Capitol. *Id.* Yoder entered the Capitol from the Upper West Terrace of the West Front through the Senate Wing Door at approximately 3:14 p.m. *Id.*

When Yoder entered the Capitol, he observed shattered glass, a broken door, and people climbing in and out of smashed windows. *Id.* at 7–8. He saw law enforcement officers, heard a blaring siren, and smelled pepper spray or tear gas. *Id.* at 8. Shortly after he entered the building, Yoder climbed a pile of broken wooden furniture and swung his flagpole around, narrowly missing the other rioters behind him. *Id.* at 9; Gov't Opp'n 2, ECF No. 87. While atop a mound of destroyed Capitol property, Yoder yelled "We've been so weak. We've lost any kind of credibility, because all we ever do is cave. We don't riot. We don't do bad things. We keep the law." FOF at 9. After delivering this speech, apparently unaware of its irony, Yoder made his way to the Crypt on the

first floor where he posed for pictures with other rioters. *Id.* When Yoder encountered a Capitol Police Officer who directed him to exit the building, he finally left through the Senate Wing Door after having spent roughly twenty minutes in the Capitol. *Id.*

The Court presided over a two-day bench trial that began on March 20, 2024. There, Yoder testified that he believed that he was permitted in certain areas of the Capitol building because law enforcement officers were not actively stopping him from being there and claimed that he was attempting to bring order out of chaos. FOF 8–9. However, the Court did not find those claims credible in light of the evidence that Yoder observed barricades and broken windows, smelled pepper spray or tear gas, and heard a siren blaring while he was inside the Capitol. *Id.* Accordingly, the Court found Yoder guilty of entering and remaining in a restricted building or grounds in violation of 18 U.S.C. § 1752(a)(1); disorderly and disruptive conduct in a restricted building or grounds in violation of 18 U.S.C. § 1752(a)(2); violent entry and disorderly conduct in a Capitol building or grounds in violation of 40 U.S.C. § 5104(e)(2)(D); and parading, demonstrating, or picketing in a Capitol building in violation of 40 U.S.C. §5104(e)(2)(G). *Id.* at 21.

The Court then sentenced Yoder to 12 months of incarceration followed by a 12-month term of supervised release, Sentencing Tr. 22, ECF No. 80. After sentencing, Yoder participated in interviews that were posted online in which he made baseless accusations about his case and this Court's impartiality before soliciting money from supporters. Gov't Opp'n 14; *see* Jim Hoft, *A Perfect Metaphor of Our Time: Biden Regime Sentences 'George Washington' to One Year in Prison for Walking inside US Capitol—Then Steals His Clothes (VIDEO) . . . Please Donate Below*, Gateway Pundit (Sep. 4, 2023, 8:00 AM), https://www.thegatewaypundit.com/2023/09/story-our-time-biden-regime-sentences-george-washington/ [https://perma.cc/4R4S-2HJS]; *Joe Oltmann and David Clements Live with Isaac Yoder: J6, Justice for All, Election Interference*, FrankSpeech,

https://frankspeech.com/Video/joe-oltmann-and-david-clements-live-with-isaac-yoder-j6-justice-for-all-election-interference [https://perma.cc/6ZTX-GTEH]. In one interview, Yoder speculated that this Court's verdict was not based on facts but that this Court might have "just sign[ed] off on something." Hoft, *supra* 28:15-29:15 ("There is no way to get a fair trial in D.C. with the jury. These judges, I mean, even if they are corrupt or left wing, they have to at least look at some facts . . . He still found me guilty of all four counts, but I wonder how much of that . . . you know that's kind of speculation, was that him or did he just sign off on something?").

Yoder has appealed his sentence, and that appeal remains pending. ECF No. 78. In the interim, Yoder has filed the instant motion for an indicative ruling on a sentence reduction pursuant to Federal Rule of Criminal Procedure 37. *See* Def's Mot. The government filed a response on April 8, 2024, ECF No. 87, to which Yoder replied on April 15, 2024. ECF No. 92. Yoder's motion is now ripe for the Court's consideration.[1]

## II.    LEGAL STANDARD

As a general matter, federal courts are forbidden from modifying a term of imprisonment absent one of "a few narrow exceptions." *Freeman v. United States*, 564 U.S. 522, 526 (2011). One such exception is located at 18 U.S.C. § 3582(c)(2). Section 3582(c)(2) permits a court to reduce a sentence based on later-enacted, retroactive amendments to the Guidelines. More

---

[1] On July 1, 2024, Yoder was released from prison and began his year of supervised release. *See Find an Inmate*, Federal Bureau of Prisons, https://www.bop.gov/inmateloc/ (last visited July 3, 2024); *see also* J. 4, ECF No. 76. Yoder's release raises the question of whether his motion for a sentence reduction has become moot, as he is no longer subject to a prison sentence. However, Yoder's motion is not moot because a favorable ruling on that motion would have a meaningful effect on this Court's analysis if Yoder later sought a reduction in his term of supervised release. *See, e.g.*, *United States v. Epps*, 707 F.3d 337, 345 (D.C. Cir. 2013) (holding that the defendant's success on a § 3582(c)(2) motion "would necessarily inform the district court's evaluation of a motion for termination or reduction of his term of supervised release under § 3583(e)(1) or (e)(2)"); *accord In re Sealed Case*, 809 F.3d 672, 675 (D.C. Cir. 2016) ("We nonetheless find that the possibility of a reduction of supervised release is not unduly speculative in these circumstances so as to render the case moot."). Therefore, under the law of this Circuit, Yoder's motion for a sentence reduction is appropriate for review despite his release from prison.

precisely, that section authorizes a sentence reduction when "a defendant . . . has been sentenced to a term of imprisonment based on a sentencing range that has subsequently been lowered by the Sentencing Commission pursuant to 28 U.S.C. 944(o) . . . after considering the factors set forth in section 3553(a) to the extent that they are applicable, if such a reduction is consistent with applicable policy statements issued by the Sentencing Commission." 18 U.S.C. § 3582(c)(2).

In April of 2023, the Sentencing Commission submitted to Congress an amendment to the Guidelines often referred to as "Amendment 821" or the "2023 Criminal History Amendment." *Material Relating to the 2023 Criminal History Amendment*, United States Sentencing Commission, https://perma.cc/34ZG-KPBD (last visited June 26, 2024). "Part B, Subpart 1 of Amendment 821 creates a new Chapter Four guideline at § 4C1.1 decreasing by two the offense levels for defendants who did not receive any criminal history points and whose instant offense did not involve specific aggravating factors," including that "the defendant did not possess . . . a firearm or other dangerous weapon . . . in connection with the offense." *U.S. Sentencing Commission Votes to Allow Retroactive Sentence Reductions and Announces Its Next Set of Policy Priorities*, United States Sentencing Commission (Aug. 24, 2023), https://perma.cc/7LJ7-G8DF; U.S.S.G. § 4C1.1(a)(7). Amendment 821 became effective on November 1, 2023 and has retroactive effect pursuant to the policy statement at § 1B1.10. *See* U.S.S.G. § 1B1.10(d).

A court engages in a two-step inquiry when evaluating whether a sentence reduction is warranted under 18 U.S.C. § 3582(c)(2). *See Dillon v. United States*, 560 U.S. 817, 826 (2010). First, the court determines whether a defendant is eligible for a sentence reduction and to what extent. *Id.* at 827. In doing so, the court must "'determin[e] the amended guideline range that would have been applicable to the defendant' had the relevant amendment been in effect at the time of the initial sentencing." *Id.* (quoting U.S.S.G. § 1B1.10(b)(1)). If the defendant is eligible for a

5

sentence reduction, the court must proceed to the second step, which is "to consider any applicable § 3553(a) factors and determine whether, in its discretion, the reduction authorized by reference to the policies relevant at step one is warranted in whole or in part under the particular circumstances of the case." *Id.* "This understanding of § 3582(c)(2) [is] a narrow exception to the rule of finality." *Id.*

### III.  DISCUSSION

Yoder's motion for a sentence reduction requires the Court to answer two questions: (1) whether he is eligible for a sentence reduction under U.S.S.G. § 4C1.1; and (2) if so, whether a reduction is warranted after considering the 18 U.S.C. § 3553(a) factors as applied to the circumstances of this case. Because the answer to both of these questions is no, Yoder's motion fails at both steps of the inquiry. Accordingly, his motion for a sentence reduction is **DENIED.**

#### a.  Yoder Is Not Eligible for a Sentence Reduction

Yoder is ineligible for a sentence reduction under § 4C1.1 because he carried a pointed metal sword while committing offenses on restricted Capitol grounds.[2] To qualify for a two-level reduction under § 4C1.1, a defendant must have zero criminal history points and not fall under any of the section's several enumerated exclusions. U.S.S.G. § 4C1.1. One such exclusion is for defendants who possessed a dangerous weapon in connection with their offenses. *Id.* § 4C1.1(a)(7). Because Yoder possessed a dangerous weapon in connection with his offenses, he is ineligible.

---

[2] The Court's analysis below focuses on Yoder's sword. However, as the government notes, the tall flagpole that Yoder carried also shares characteristics with objects that courts in this district have found to be dangerous weapons. *See* Gov't Opp. 8 (citing *United States v. Southard Rumsey*, 21-cr-00387 (APM) (ECF No. 72 at 18-21, 74-75) (finding "solid wooden flagpole that probably looked like it was at least 5 to 6 feet in length" was a dangerous weapon under U.S.S.G. § 2A2.2(b)(2)(B)); *United States v. Michael Steven Perkins*, 21-cr-00447-4 (CJN) (ECF No. 279 at 8, 16, 51) (applying dangerous weapon enhancements for flagpole pursuant to U.S.S.G. § 2A2.4(b)); *United States v. Thomas Webster*, 21-cr-00208 (APM) (ECF No. 124 at 19) (calculating guidelines and applying enhancement for flagpole used as a dangerous weapon under U.S.S.G. § 2A2.2(b)(2))). However, the Court need not determine here whether Yoder's flagpole is a dangerous weapon as his pointed metal sword alone is a quintessential example of a dangerous weapon.

One could reasonably assume that it goes without saying that a pointed metal sword is a dangerous weapon, but because Yoder disagrees, the Court will explain why this is so within the meaning of § 4C1.1.[3] Section 1B1.1 defines a dangerous weapon as "(i) an instrument capable of inflicting death or serious bodily injury; or (ii) an object that is not an instrument capable of inflicting death or serious bodily injury but (I) closely resembles such an instrument, or (II) the defendant used the object in a manner that created the impression that the object was such an instrument." U.S.S.G. § 1B1.1 app. n.1 (E). While Yoder maintains that his sword was a "play sword" or "costume sword," it—like other swords—was metal and pointed, and thereby "an instrument capable of inflicting death or serious bodily injury." *See* Def.'s Mot. 5; § 1B1.1. Indeed, throughout history, swords have been used for this very purpose, and to great effect.

In other January 6th cases, courts in this district have found that objects with less obvious propensity for harm than a metal sword qualify as a dangerous weapon within the meaning of § 1B1.1. *See, e.g*, *United States v. Roe*, 23-cr-277 (CKK) (ECF No. 28 at 2) (holding that a metal pitchfork with pointed tips operates as a dangerous weapon capable of inflicting serious bodily injury because it can cause stab wounds). And even if Yoder's sword was a prop, it nonetheless "closely resemble[d]" a real sword—which is sufficient to be considered a dangerous weapon under the Guidelines. § 1B1.1. While the Court acknowledges that there may be tough cases where it is unclear whether an object is a dangerous weapon, Yoder's sword does not present such a case.

Notwithstanding its appearance and capacity for harm, Yoder argues that his sword cannot be a dangerous weapon because it was merely a component of his costume.[4] Setting aside the fact

---

[3] Section 4C1.1(b) specifies that "[d]angerous weapon," as used in § 4C1.1, has the meaning given to that term in the Commentary to U.S.S.G. § 1B1.1 (Application Instructions). Thus, the Court will evaluate the dangerousness of Yoder's sword pursuant to § 1B1.1.

[4] Yoder also argues that the mere potential for his sword to cause harm is not enough to qualify it as dangerous weapon. In support of his argument, Yoder cites cases unrelated to § 1B1.1 or § 4C1.1 to argue that because "almost anything,"

that a weapon can be part of a costume *and* dangerous, Yoder's argument is doomed by this Court's prior decisions in January 6th cases. Yoder's argument resembles *United States v. Chansely*, in which another defendant who dressed in costume while storming the Capitol attempted to minimize the dangerousness of the spear he wielded by characterizing it as a traditional Native American design rather than a dangerous weapon. 525 F. Supp. 3d at 161. This Court found that claim "meritless" and held that "a six-foot pole with a metal spearhead fixed to the top is, undoubtedly, a dangerous weapon." *Id.* at 162. Likewise, this Court now holds that Yoder's metal sword is, too, undoubtedly a dangerous weapon.[5] An otherwise dangerous weapon does not suddenly become benign when included as part of a costume. Were that the case, every criminal could simply dress up as their favorite character before breaking the law to evade consequences associated with their use of dangerous weapons. This Court will not welcome such absurdity by giving special treatment to defendants who cosplay while committing crimes.

Further, Yoder possessed his sword in connection with his offenses. Yoder argues that "there is no evidence he possessed those items in order to aid his trespass into the Capitol." Def.'s Mot. 12. But that is not the question the Court must consider. "Offense" under § 4C1.1 "means the offense of conviction *and all relevant conduct* under § 1B1.3 (Relevant Conduct) unless a different meaning is specified or is otherwise clear from the context." U.S.S.G. § 1B1.1 cmt. n.1(I) (emphasis added); *see id.* § 4C1.1(b)(1). Relevant conduct includes "all acts and omissions committed, aided, abetted, counseled, commanded, induced, produced, or willfully caused by the

---

including "rubber boots, dogs, . . . [and] rings" can count as a dangerous weapon, the Court should look to whether a defendant "used, attempted to use, or threatened to use" the items as a weapon. Def.'s Mot. 9–10. But that conclusion ignores the text of § 4C1.1(a)(7), which applies to defendants who "possess" a dangerous weapon and doubly ignores the text of § 1B1.1 which defines "dangerous weapon[s]" with reference to what they are "capable" of.

[5] While Chansley made this argument in the context of 18 U.S.C. §§ 111 and 113, the Court's rationale—that the defendant cannot minimize the dangerousness of their weapon by reference to its inclusion in a costume or as a design—remains the same here under § 4C1.1.

defendant," as well as certain acts and omissions of others committed as part of "a jointly undertaken criminal activity." *Id.* § 1B1.3(a)(1). Accordingly, this Court is tasked with determining whether Yoder's sword was possessed in connection with the totality of his relevant conduct on January 6th—not just his entrance into the Capitol.

The Court finds that Yoder's possession of a sword contributed to the severity of his conduct on January 6th. Yoder was convicted, not merely of trespass, but rather of a variety of offenses including offenses related to his disorderly and disruptive conduct. FOF 21. Yoder's unlawful possession of a sword plainly contributed to the disorder, disruption, and potential for violence at the Capitol on January 6th. Yoder carried a pointed metal sword into a riotous environment replete with violence and lawlessness. "'Even the presence of one unauthorized person in the Capitol is reason to suspend Congressional proceedings,' and disruption grows with the mob." *United States v. Grider*, 651 F. Supp. 3d 1, 18 (D.D.C. 2022) (Kollar-Kotelly, J.) (quoting *United States v. Rivera*, 607 F. Supp. 3d 1, 8 (D.D.C. 2022), *aff'd*, No. 22-3088, 2023 WL 8594077 (D.C. Cir. Dec. 12, 2023)). If an unauthorized person in the Capitol is already disorderly and disruptive, throwing an unauthorized weapon into the mix only makes things worse. It is one thing to storm the Capitol, it is another to do so while sporting dangerous weaponry.

Additionally, by Yoder's own logic, his possession of a sword was also connected to his offense of parading and picketing. Yoder testified that his sword was a part of his costume, which he wore "to send a message." *See* FOF 6. But Yoder's illegal effort to express a message with other rioters at the Capitol on January 6th—through costume or otherwise—is at the core of his parading, demonstrating, or picketing conviction under 40 U.S.C. §5104(e)(2)(G). By arguing that his sword was part of his costume, Yoder has all but conceded its connection to his illegal parade and demonstration inside the Capitol. Thus, because Yoder's sword was a dangerous weapon, and

because his possession of the sword was connected to his offenses, the Court holds that Yoder is

ineligible for a sentence reduction under § 4C1.1.

      **b. The § 3353(a) Factors Strongly Weigh Against a Sentence Reduction.**

      Even if Yoder were eligible for a sentence reduction, the Court would not reduce his

sentence pursuant to the relevant factors in 18 U.S.C. § 3553(a). Section 3553(a) directs a court to

"impose a sentence sufficient, but not greater than necessary, to comply with" the purposes of

sentencing, including:

> **(a)(1)** the nature and circumstances of the offense and the history and
> characteristics of the defendant;
> **(2)** the need for the sentence imposed—
> > **(A)** to reflect the seriousness of the offense, to promote respect for the law,
> > and to provide just punishment for the offense;
> > **(B)** to afford adequate deterrence to criminal conduct;
> > **(C)** to protect the public from further crimes of the defendant; and
> > **(D)** to provide the defendant with needed educational or vocational training,
> > medical care, or other correctional treatment in the most effective manner;
>
> . . .

18 U.S.C. § 3553(a).

      In this case, the § 3553(a) factors counsel against granting Yoder's motion for a sentence

reduction. First, Yoder's decision to storm the Capitol building on January 6th with other rioters

represents a severe offense. Indeed, this Court has repeatedly expressed that the January 6th riots

are crimes serious in nature. *See, e.g.*, *United States v. Johnatakis*, 21-cr-91 (RCL) (ECF No. 272).

And this Court has noted that by sentencing defendants, the Court "aims to discourage these

defendants from future violence, dissuade others from taking inspiration from the Capitol riot, and

express the community's moral disapproval of this conduct." *Id.* at 5–6. While Yoder argues that

his case has distinguishable features from other January 6th defendants who assaulted police

officers and damaged property inside the Capitol building, the Court already expressed that his

conduct was a "serious offense" as he decided to participate in an event that has gravely scarred our country. Sentencing Tr. 20–21.

Second, Yoder's behavior after he left the Capitol also suggests that a sentence reduction is unwarranted. Yoder displayed a lack of respect for this Court when he gave false testimony and attempted to downplay the seriousness of his conduct, thereby committing perjury. *See* FOF 8–9; Presentence Investigation Report 11, ECF No. 69. Accordingly, this Court rejected Yoder's false testimony and applied two additional points at sentencing for obstructing the administration of justice pursuant to U.S.S.G. § 3C1.1. *See* Sentencing Tr. 4. Undeterred, Yoder has continued to spread falsehoods about his conviction and this Court after his trial and his sentencing in various interviews. *See Supra* Part I. This pattern of behavior demonstrates Yoder's lack of remorse and antipathy towards the rule of law.

Finally, Yoder's history and characteristics do not warrant a sentence reduction. Yoder argues that his lack of criminal history and post-sentencing conduct suggest that a sentence reduction is appropriate. Def.'s Mot. 15–16. However, the Court finds that argument unpersuasive. This Court already considered and accounted for Yoder's character in his original sentencing. *See id.* at 21. Indeed, this Court gave Yoder a sentence in the middle of the recommended Guidelines range after considering his "nature and [his] background and [the] good life [he has] lived." *Id.* Notwithstanding the supportive letters provided by Yoder's friends and family, the Court was concerned—and remains concerned—about "another incident like this after the next election . . . where our whole democracy is teetering on whether or not the whole functioning of government comes to a screeching halt because of a riot in our nation's Capitol." *Id.* That remains true. While the Court commends Yoder for his good conduct post sentencing—excluding his interviews—a few months of good conduct cannot erase the permanent damage that his behavior,

11

and the behavior of others who stormed the Capitol, caused to our country. Accordingly, the Court finds that a sentence reduction is unwarranted under § 3553(a).

## IV.    CONCLUSION

Yoder is ineligible for a sentence reduction under U.S.S.G. § 4C1.1. And even if Yoder were eligible, this Court would decline to reduce his sentence in accordance with 18 U.S.C. § 3553(a). However you slice it, Yoder is not entitled to a reduced sentence. This Court takes no pleasure in sentencing individuals to incarceration, but it declines Yoder's invitation to upset its carefully considered sentence without basis in law.

For the reasons explained above, it is hereby **ORDERED** that Yoder's motion [83] seeking an indicative ruling on a sentence reduction is **DENIED.**

It is **SO ORDERED.**

SIGNED this _____ day of July, 2024.

Royce C. Lamberth
United States District Judge